SCHOMER, Plaintiff, v. SCOTT, et al, Defendants.

(274 N. W. 556)

(File No. 8073. Opinion filed June 22, 1937)

*Sutherland & Payne,* of Pierre (*H. W. Markey,* of Huron, *R. B. Palmer,* of Woonsocket, *A. F. Schleher,* of Redfield, *Stanley R. Voas,* of McIntosh, *H. F. Ricketts,* of Mitchell, *G. F. Sherwood,*

of Clark, and *P. C. Hvistendahl,* of 'Mobridge, of counsel), for Plaintiff.

*James F. Callahan,* of Fort Pierre, *Clair Roddewig,* Atty. Gen., and *D. C. Walsh* and *R. F. Drewry,* Asst. Attys. Gen., for Defendants.

*Andrew S. Bogue,* of Parker, amicus curiæ.

SMITH, J. Deeming itself obligated to the permanent school and other educational funds of the state in the aggregate sum of $214,255.61, Stanley county undertook to issue and sell its negotiable bonds in order to raise money with which to forthwith discharge its obligation. The plaintiff, as a taxpayer and citizen of said county, seeks to restrain, enjoin, and prohibit the officers of said county from issuing bonds for such purpose, and also to restrain and enjoin the commissioner of school and public lands and the treasurer of 'South Dakota from demanding or receiving payment of said purported debt. Because of the importance of the issues involved to the state at large, the matter has been entertained as an original proceeding. We deal with the questions presented for solution in the order of their importance.

Does article 8 of the Constitution of the state of South Dakota, which deals with these school and educational funds, impose an absolute liability on the several counties of the state for the payment of semiannual interest on, and for the repayment of losses to, the principal of such funds apportioned to them for investment? The officers of the county and state assert that such is the liability of Stanley county in the instant case, while the plaintiff-taxpayer contends that the county is only liable as a trustee, and that therefore no liability accrues until it be shown that the county has violated its trust.

There is no issue here dealing with loss suffered through the defalcation, negligence, mismanagement, or fraud of the county or its officials or agents. It is manifest that the losses admitted in this litigation are the fruits of an extended period of inflation followed by a sharp deflation and drought. It is common knowledge that loans heretofore made on real estate throughout large sections of the state on a basis that most minds would have then agreed was conservative and secure, have resulted in absolute loss

and in the ownership of unmarketable lands solely because of the unforseeable, sharp decline in the value of all agricultural lands.

It is very probable that the framers of the Constitution who devised the plan by which the state would attempt to safeguard its educational endowments for the benefit of future generations, failed utterly to visualize the possibility that practically all of the funds apportioned to certain of the counties of our state might become lost through such a chain of circumstances without fault or mismanagement on the part of the county, and that therefore they did not consider the hardship which such a loss might impose on the taxpayers of certain sections of our state. It is perhaps equally probable that if the article in question were now to be framed, in the light of the experience of the last two decades, a more equitable system would be adopted to safeguard these sacred educational funds. However, if the meaning of the words used in the Constitution as adopted by our people is clear, and we think it is, our duty to declare the meaning as it there appears is plain. Constitutions will become but "scraps of paper," and "government of law" will become a matter of history, if courts fail in the discharge of this duty.

■■ "The object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it." Cooley's Constitutional Limitations (8th Ed.) Vol. I, p. 124. Intent cannot be completely known until there is understanding of the full purpose which has prompted the framing of any document. In the instant case, there is no room for doubt as to the purpose which prompted the framers of our Constitution in using the language contained in article 8 thereof. They have stated their purpose in clear and unmistakable language, and that purpose has been approved by the sovereign people through the adoption of our fundamental charter. They state:

Article 8, § 1: "The stability of a republican form of government depending on the morality and intelligence of the people, it shall be the duty of the legislature to establish and maintain a general and uniform system of public schools wherein tuition shall be without charge, and equally open to all; and to adopt all suitable means to secure to the people the advantages and opportunities of education."

And thereupon they state:

Section 2: "* * * the proceeds of all gifts or donations * * * and all property otherwise acquired for public schools, shall be and remain a perpetual fund for the maintenance of public schools in the state. It shall be deemed a trust fund held by the state. The principal shall forever remain inviolate, and may be increased, but shall never be diminished."

It becomes apparent at the outset that this purpose to devise a plan rendering it impossible for funds dedicated for sacred educational purposes to ever become lost or diminished, pervades the whole of the constitutional provision on that subject and must override and set aside any mere technical argument based upon particular words or even upon what may seem to be literal meanings.

The present controversy must be resolved by placing construction upon the following provisions of article 8 of the Constitution:

Section 2: "All proceeds of the sale of public lands that have heretofore been or may hereafter be given by the United States for the use of public schools in the state; all such per centum as may be granted by the United States on the sales of public lands; the proceeds of all property that shall fall to the state by escheat; the proceeds of all gifts or donations to the state for public schools or not otherwise appropriated by the terms of the gift; and all property otherwise acquired for public schools, shall be and remain a perpetual fund for the maintenance of public schools in the state. It shall be deemed a trust fund held by the state. The principal shall forever remain inviolate, and may be increased, but shall never be diminished, and the state shall make good all losses thereof which may in any manner occur."

Section 3: "The interest and income of this fund, together with the net proceeds of all fines for violation of state laws and all other sums which may be added thereto by law, shall be faithfully used and applied each year for the benefit of the public schools of the state, and shall be for this purpose apportioned among and between all the several public school corporations of the state in proportion to the number of children in each, of school age, as may be fixed by law; and no part of the fund, either principal or interest, shall ever be diverted, even temporarily, from

this purpose or used for any other purpose whatever than the maintenance of public schools for the equal benefit of all the people of the state."

Section 7: "All lands, money or other property, donated, granted or received from the United States or any other source for a university, agricultural college, normal schools or other educational or charitable institution or purpose, and the proceeds of all such lands and other property so received from any source, shall be and remain perpetual funds, the interest and income of which, together with the rents of all such lands as may remain unsold, shall be inviolably appropriated and applied to the specific objects of the original grants or gifts. The principal of every such fund may be increased, but shall never be diminished, and the interest and income only shall be used. Every such fund shall be deemed a trust fund held by the state, and the state shall make good all losses therefrom that shall in any manner occur."

Section 11: "The moneys of the permanent school and other educational funds shall be invested only in first mortgages upon good improved farm lands within this state, as hereinafter provided, or in bonds of school corporations within this state, or in bonds of the United States or of the state of South Dakota or of any organized county, township or incorporated city in said state. The legislature shall provide by law the method of determining the amounts of said funds, which shall be invested from time to time in such classes of securities respectively, taking care to secure continuous investments as far as possible.

"All moneys of said funds which may from time to time be designated for investment in farm mortgages and in the bonds of school corporations, or in bonds of organized counties, townships or incorporated cities within this state, shall for such purpose be divided among the organized counties of the state in proportion to population as nearly as provisions by law to secure continuous investment may permit. The several counties shall hold and manage the same as trust funds, and they shall be and remain responsible and accountable for the principal and interest of all such moneys received by them from the date of receipt until returned because not loaned; and in case of loss of any money so apportioned to any county, such county shall make the same good out of its

common revenue. Counties shall invest said money in bonds of school corporations, counties, townships or cities, or in first mortgages upon good improved farm lands within their limits respectively. The amount of each loan shall not exceed one-third of the actual value of the lands covered by the mortgage given to secure the same, such value to be determined by the board of county commissioners of the county in which the land is situated and in no case shall more than five thousand ($5,000) dollars be loaned to any one person, firm or corporation and the rate of interest shall not be less than five per cent. per annum and shall be such other and higher rate as the legislature may provide and shall be payable semi-annually on the first day of January and July: Provided, that whenever there are moneys of said fund in any county amounting to one thousand dollars that cannot be loaned according to the provisions of this section and any law pursuant thereto, the said sum may be returned to the state treasurer to be intrusted to some other county or counties, or otherwise invested under the provisions of this section.

"Each county shall semi-annually, on the first day of January and July, render an account of the condition of the funds intrusted to it to the auditor of the state, and at the same time to pay to or account to the state treasurer for the interest due on all funds intrusted to it.

"The legislature may provide by general law that counties may retain from interest collected in excess of five per centum per annum upon all said funds intrusted to them, not to exceed one per centum per annum. But no county shall be exempted from the obligation to make semi-annual payments to the state treasurer of interest at the rate provided by law for such loans, except only said one per centum, and in no case shall the interest so to be paid be less than five per centum per annum.

"The legislature shall provide by law for the safe investment of the permanent school and other educational funds, and for the prompt collection of interest and income thereof, and to carry out the objects and provisions of this section."

Section 13: "All losses to the permanent school or other educational funds of this state which shall have been occasioned by the defalcation, negligence, mismanagement or fraud of the agents

or officers controlling and managing the same, shall be audited by the proper authorities of the state. The amount so audited shall be a permanent funded debt against the state in favor of the fund sustaining the loss upon which not less than six per centum of annual interest shall be paid. The amount of indebtedness so created shall not be counted as a part of the indebtedness mentioned in article XIII, section 2."

A review of these controlling provisions discloses that they contain one set of provisions dealing with the corpus or principal of these funds, and a separate set of provisions controlling interest to be realized thereon. These provisions must be considered separately.

Neither the industry or ingenuity of counsel nor the painstaking analysis of this court has discovered aught to render uncertain the literal meaning of the central clause of section 11 dealing with the liability of the county for loss of principal. This clause reads, "And in case of loss of any money so apportioned to any county, such county shall make the same good out of its common revenue." Attempt is made to avoid this literal meaning by over-emphasis of the word "trust," and by comparison of the language of this clause with the more comprehensive language of the clause dealing with the liability of the state.

There is no significance in the use of the word "trust" in connection with the relation of the county to these funds other or different than flows from the use of the same term in describing the relation of the state to the identical funds. Under the provisions of the Constitution, both the state and the county become trustees of the funds for the benefit of the school corporations of the state. If this word limits liability in the one instance, it must perform a like function in the other. To hold that the state and counties were no more than mere trustees of these funds, would remove the keystone of the arch through which its designers intended to supply these funds with perpetual support.

Neither do we discover any significance in the fact that the provision imposing liability on the state is broad and all-comprehensive in that it reads "* * * shall make good all losses therefrom that shall in any manner occur." We may not presume that the people used the clause dealing with the state liability to over-

ride another equally definite provision contained in the same article. Neither may we presume that the people did not intend to add meaning by the use of the clause dealing with county liability. To hold that the several counties are liable only as trustees, and that ultimate loss must fall on the state as a whole, renders the clause in question dealing with the counties nugatory. The remainder of the sentence in which this clause appears, viz., "The several counties shall hold and manage the same as trust funds, and they shall be and remain responsible and accountable for the principal and interest of all such moneys received by them from the date of receipt until returned because not loaned," is completely adequate to create the trust relationship and to entail all of the responsibilities and liabilities which flow from that relationship. The clause in question either adds absolute liability or nothing.

▮▮ Keeping in mind that these words were used in furtherance of a dominant purpose that these funds "shall be and remain perpetual funds" and that "Such fund may be increased, but shall never be diminished," can it be doubted that the much-quoted words of Chief Justice Marshall are here peculiarly applicable? In the case of Gibbons v. Ogden, 9 Wheat. 1, 188, 6 L. Ed. 23, he said: "As men, whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said."

The framers of the Constitution said that "Such county shall make the same good out of its common revenue," and we conclude that they meant what they said.

▮ In contending that the county is not liable for interest until received by it, the taxpayer directs our attention to the whole of the sentence as follows, "The several counties shall hold and manage the same as trust funds, and they shall be and remain responsible and accountable for the principal and interest of all such moneys received by them from the date of receipt until returned because not loaned; and in case of loss of any money so apportioned to any county, such county shall make the same good out of its common revenue," and points out that the last clause

thereof dealing with losses has application only to the money so apportioned to any county, as contra-distinguished from interest. He further calls attention to another sentence of the same section, as follows: "Each county shall semi-annually, on the first day of January and July, render an account of the condition of the funds intrusted to it to the auditor of the state, and at the same time pay to or account to the state treasurer for the interest due on all funds intrusted to it."

From the fact that the first provision dealing with losses is confined to the funds apportioned to the county, and that the second provision includes the word "account," he argues that the framers of the Constitution did not intend to hold the county liable for interest except as it was received by the county. He states: "If the constitution makers had intended that the county should make good the loss of interest, it would have stated so plainly, and would not have provided that the county should make good the money apportioned, only."

We regard this contention as untenable. To so hold would render meaningless the further provision of the Constitution contained in the same section reading as follows: "But no county shall be exempted from the obligation to make semi-annual payments to the state treasurer of interest at the rate provided by law for such loans. * * *" It would be unreasonable to suppose that the framers of the Constitution visualized any possibility that a future Legislature might relieve a county from its liability as trustee to pay over interest actually received by it. This sentence clearly shows, in our opinion, that the framers of the Constitution regarded the language theretofore used as sufficient to impose absolute liability for interest upon the county, and that they desired to foreclose any possibility of misconstruction. It is reasonable to believe that the word "account" was only inserted to cover the right of the county to claim credit for prepayments made prior to the semiannual payment dates.

Only through the use of the theory of absolute liability for interest can all of these provisions be brought into harmony. Analysis demonstrates that the sentence first quoted is directed to the loss of funds actually received by the county. If, as we believe, absolute liability was intended to be placed upon the county for

the prompt payment of semiannual interest out of its own funds, there could be no reason to provide for the contingency of loss of interest in the sense that there might be a loss of the moneys turned over to the county for investment. The obligation of the county to pay semiannual interest would be constant, and could never be the subject of "loss," although it might be the subject of "default." Further, the word "account" appears in connection with the words "interest due" rather than "interest received."

We find the conclusion inescapable that when these sentences are read and considered as a whole, in the light of the purpose of the article in which they appear, they portray an intention to secure the complete and prompt payment of all of the semiannual interest accruing on the funds apportioned to the counties for investment, to the end that this income might be in turn regularly and promptly apportioned among the school corporations of the state for the support of the educational institutions and the common schools of the state.

These conclusions with reference to principal and interest have been influenced and strengthened as we have considered that which preceded, as well as that which came after, the adoption of the Constitution.

In reading the constitutional debates of the Sioux Falls Convention of 1885, by which this article was framed, we discover that just prior to referring the whole question back to the Committee on Education, Mr. A. Haines said:

"Now after taking the sentiment of the Convention, and a number of the Committee (I have not been able to consult all of them) it is suggested that perhaps the Convention had better refer this matter back to the Committee. If it is the sentiment of the Convention we can trust Dakota farm mortgages, provided some other safe course,—for instance if the plan would be approved of apportioning this school fund among the counties of the State for investment upon some proper principle, then hold each county liable in its corporate capacity for every cent of the principal and the annual payment into the State treasury of every cent of the interest." South Dakota Constitutional Debates, 1885, Vol. I, page 518.

Then again, at the time of the report of the Committee, and just prior to the time of the final adoption of the article, in his explanatory remarks, Mr. Haines said: "The general outlines of this report, Mr. President, have been incorporated in former remarks. That is all covered in the statements, excepting in so far as the principal and interest of United States is concerned, so that the counties will be made responsible for the principal and interest."

And further: "The second subdivision provides in substance that these moneys shall be apportioned, so far as the provisions of the law looking towards continuous investments, will permit the moneys of counties in proportion to their population, and these counties shall become responsible for the principal and interest. Then the subject I call attention to is in respect to the paying of interest. There will be a liability from the day of their receiving it until they return the same. The Committee thought it inadvisable to send these moneys to counties and charge them interest from the day of investing, for the reasons: 1. That there would be a temptation to let the money lie idle in the vaults of some bank; and the second would make a confusion in the matter of the county's interest."

And further: "Now, while on that same subject, it is provided, in order that counties may not be compelled to pay interest on moneys lying idle in their county treasuries, that whenever they accrue $1,000, they shall be sent back to the State Treasury, and the counties shall pay interest semi-annually on the first day of January and July." South Dakota Constitutional Debates, 1885, Vol. I, pp. 595, 596.

Thereupon, after brief discussion, the report was adopted by the convention.

Nearly half a century has now transpired since the adoption of the Constitution, and many statutes have been enacted in furtherance of its plan for the handling of school and educational funds. We have examined these statutes, and find that the legislative interpretation has been wholly consistent with the theory of absolute liability of the county for principal and interest. We call attention to the following revealing instances of legislative interpretation:

Chapter 97 of the Session Laws of 1897 inserted a provision which remains a part of the law on that subject today:

"If no other person shall bid the full amount due upon such mortgage upon the foreclosure sale of the same, with the costs and expenses of the foreclosure and sale, the states attorney or county auditor shall bid the land in in the name of the county, and if the same is not redeemed as provided by law, the sheriff's deed shall be made to the said county and the said county shall thereby become the owner of said land."

Chapter 144 of the Session Laws of 1893, and chapter 224 of the Session Laws of 1911 gave special attention to a system of accounts between the commissioner of school and public lands on behalf of the state and the counties. In section 6 of the act of 1893, the Legislature said: "* * * and with such report to the state treasurer the county treasurer shall pay to the state treasurer all interest due to the date of payment upon such permanent school and other educational funds for which such county is liable."

In section 63 of the act of 1911, they said: "* * * interest on permanent school and endowment funds which was due from the county to the state."

Similar language appears in section 5703 of the Revised Code of 1919.

It is also interesting to note that section 5698, Revised Code of 1919, which became a part of our law as chapter 224 of the Session Laws of 1911, in dealing with the return by the county of money not loaned, provides as follows: "* * * the county auditor shall certify the facts to the commissioner with a statement that such funds cannot be loaned, and thereupon it shall be the duty of the commissioner to order such funds forthwith returned to the state treasury with interest thereon as herein provided for a period of sixty days."

Further, by the first sentence of section 1 of chapter 176 of the laws of 1935, the Legislature said: "Each county of the state is indebted to the State and its permanent school fund in a sum equal to the aggregate amount received from the principal of said fund for investment, and not returned to the state treasurer, together with any unpaid interest thereon and together with any

other unpaid items of the character referred to in Revised Code Section 5703 and Section 5704 as amended by Chapter 218 of the Session Laws of 1929."

We therefore conclude that the liability of Stanley county for losses of principal of the character admitted in the pleadings in this proceeding, and its liability for semiannual interest to the state on all funds received by it, is primary and absolute.

 Is the liability imposed on the counties pursuant to article 8 subject to the limitations contained in section 4 of article 13 of the Constitution limiting the indebtedness of counties to 5 per centum of their assessed valuation? The taxpayer contends that the proposed issue of bonds will augment the debt of the county beyond the 5 per centum limitation contained in section 4 of article 13 of the Constitution, and that therefore the county is without power to issue the bonds. This contention is untenable. It is the settled law of this jurisdiction that the funding of valid existing indebtedness does not create additional indebtedness within this constitutional provision. Walling v. Lummis, 16 S. D. 349, 92 N. W. 1063; National Life Insurance Company of Monpelier, Vt. v. Mead, Treasurer, 13 S. D. 37, 82 N. W. 78, 48 L. R. A. 785, 79 Am. St. Rep. 876. There is no sufficient showing here to present a question as to the application of section 4 of article 13 to the inception of any of the debt of Stanley county to these school funds, and we therefore express no opinion on that subject.

 Does chapter 77 of the Laws of 1937 authorize counties to refund a debt other than warrant indebtedness, because of its title and origin as an amendatory act? The proceedings in question were undertaken by Stanley county under the provisions of chapter 77 of the Laws of 1937. This chapter was enacted as an amendment of section 19 of chapter 79 of the Session Laws of 1927, as amended. The title of chapter 79 of the Laws of 1927 reads as follows:

"An Act Entitled, An Act Regulating the Fiscal Management of, Fixing the Fiscal Year For, and Controlling and Regulating the Raising of Revenue and the Expenditure Thereof during each Fiscal Year by all Counties and their Institutions and Agencies, and for the Approval and Adoption of Annual Budgets of Expenditures to be made for all Purposes During each Fiscal Year;

providing for Temporary Loans secured by Delinquent Taxes and the Creation of the Delinquent Tax Fund; Prescribing the Manner of Paying Claims Filed after the Expiration of the Fiscal Year; Providing for the Raising of Revenue, in Addition to Budget Estimates and Appropriations, by Taxation; providing for the Payment of Warrant Indebtedness Outstanding at the Close of the Fiscal Year Ending December 31, 1927."

The title of chapter 77 of the Laws of 1937 reads as follows:

"An Act Entitled, An Act to Amend Section 19 of Chapter 79 of the Session Laws of 1927, as Amended by Chapter 110 of the Session Laws of 1931, as Amended by House Bill No. 7 of the Special Session of 1936, Relating to Funding and Payment of Floating Indebtedness of Counties by Issuing Bonds for Levying of Taxes and Declaring an Emergency."

Section 19 of chapter 79 of the Laws of 1927 provides for the funding of floating indebtedness by counties having at the close of the fiscal year ending December 31, 1927, such a floating indebtedness consisting of outstanding warrants and other liabilities for which warrants have not been issued. Chapter 77 of the Laws of 1937 is substantially a re-enactment of section 19 of chapter 79 of the Laws of 1927, except that it deals with counties having a floating indebtedness existing on December 31, 1936.

Predicated upon the last clause of the 1927 act, reading as follows: "Providing for the payment of Warrant Indebtedness Outstanding at the Close of the Fiscal Year Ending December 31, 1927," and the assumption that such language so restricted the title to the 1927 act and the operative effect of section 19 thereof as to limit the effectiveness of that section to the refunding of warrant indebtedness only, and further predicated upon the assumption that the title of the 1937 amendatory act is wholly insufficient to give notice of the addition of other subject-matter such as the funding of indebtedness outstanding at a time subsequent to December 31, 1927, and floating indebtedness not represented by warrants, the plaintiff-taxpayer asserts that the title of the 1937 act is wholly insufficient to render the act effective and available for the refunding of the floating indebtedness of Stanley county outstanding as of December 31, 1936, and of any indebtedness not represented by outstanding warrants.

The commissioners of Stanley county contend that the title of the 1927 act is sufficient, and that it is sufficient to sustain the act and the proceedings thereunder. As authority for their position, they cite the following rule, "On the other hand, where the title of an amendatory or supplemental act sufficiently indicates the nature of the legislation in it contained, or the nature of the changes or additions by it made, it is immaterial whether or not the provisions of the act are covered by the title of the act amended or supplemented," 59 C. J. 819, § 400, and the cases Miller et al. v. Iowa-Nebraska Light & Power Company, 129 Neb. 757, 262 N. W. 855; Miller & Lux, Inc., v. Sacramento & San Joaquin Drainage District, 182 Cal. 252, 187 P. 1041; Andrews v. Board of Commissioners of Ada County, 7 Idaho 453, 63 P. 592; Conshohocken Borough v. Montgomery County Commissioners, 14 Pa. Dist. R. 141; McLaughlin v. Summit Hill Borough, 224 Pa. 425, 73 A. 975; Memphis St. R. Co. v. Byrne, 119 Tenn. 278, 104 S. W. 460.

The thought expressed in this rule and in the opinions in the above-cited cases is included in the thought which prompted the specially concurring opinion in the case of Metropolitan Casualty Insurance Co. v. Basford, 31 S. D. 149, 139 N. W. 795, 802. In that concurring opinion, the late Mr. Judge Ellison G. Smith said: "Briefly stated, if the title of the original act is good as to that act, that title has performed its constitutional function. The only questions which can then arise are as to the amendatory act, whether it has a good title, and whether it embraces a subject germane to the subject contained in the original act. The subject of the amendatory act must be expressed in its title. The subject of an amendatory act is the particular thing which is to be added to, or taken from, the original act. If the title to the amendatory act complies with this requirement, the constitutional provision as to the title would seem to be fully satisfied. The constitutional rule applies to the title, and the subject, of an amendatory act to the same extent, and with like effect, as to an original act. It seems to me that some confusion and perhaps some slight conflict appearing in the decisions might be obviated by keeping in mind the fundamental object of the constitutional provision, namely, that one subject only shall be contained in an act, whether original or amendatory, and that subject must be expressed in the title. It would seem plain that the title of the amendatory act must refer

in some way to the original act for the purpose of identification—not because the Constitution requires any such reference. The act proposed to be amended being sufficiently identified in the title of the amendatory act, the only things necessary are that the subject of the proposed amendment be expressed in the title of the amendatory act, and that such subject be germane to the subject contained in the original act."

We find ourselves in entire agreement with the foregoing interpretation of section 21 of article 3 of the Constitution as applied to amendatory acts.

When the title of the 1937 act is tested by this rule, it clearly appears that the contentions of plaintiff cannot be sustained. The amendatory act identifies the act it purports to amend. In addition to that, it states: "Relating to Funding and Payment of Floating Indebtedness of Counties by Issuing Bonds for Levying of Taxes and Declaring an Emergency." That the funding of floating indebtedness is germane to the whole subject of budgeting was determined by this court in the case of Rowe v. Stanley County et al., 52 S. D. 516, 219 N. W. 122. It is therefore plain that the subject-matter of the amendatory act, and that of the amended act, could have been contained under a title containing a single subject. That the title of the amendatory act is sufficient to give notice to all concerned that the act was intended to provide for the funding of current floating indebtedness of all kinds and character, is too plain to require or merit discussion.

Does chapter 176 of the Laws of 1935 provide an exclusive method of discharging the indebtedness of the several counties to the school funds? In substance, chapter 176 of the Laws of 1935 provides that counties indebted to said funds, who have failed to pay the whole portion of their indebtedness, shall, on the first Tuesday in September, levy a special tax upon all of the taxable property in the county, sufficient to pay such indebtedness within a period of twenty years thereafter, which said levy shall be extended and renewed each year thereafter until said indebtedness is fully paid. When the chapter in question is read by itself, it seems to present its own best answer to the contention that the provision therein contained was intended to be exclusive, for it provides, by section 4 thereof, as follows: "Nothing contained herein shall excuse the county from sooner paying its in-

debtedness if such payment is reasonably possible from other sources than the special tax herein referred to." However, we feel constrained to consider this chapter in connection with language contained in section 11 of article 8 of the Constitution. In dealing with loss of the funds apportioned to the counties, the Constitution reads: "Such county shall make the same good out of its common revenue." For the purposes of our consideration, we assume that the proceeds from the sale of bonds are not included within the "common revenue" of a county, according to the literal meaning of those words, and, based on such assumption, we pursue the inquiry as to whether the law proscribes the issuance of bonds by the county to discharge its debts to the school funds.

A similar question was considered by this court on an advisory opinion in Re State Bonds, 7 S. D. 42, 63 N. W. 223, 226. The court was then considering whether the provision of section 13 of article 8 reading "The amount so audited shall be a permanent funded debt against the state," proscribed the issuance of bonds by the state for the purpose of discharging the liability of the state to the school funds, occasioned by the defalcation of the state treasurer. The court that submitted that advisory opinion included in its membership two men, Mr. Judge Dighton Corson and Mr. Judge Alphonso G. Kellam, who brought to bear upon the problem before them an intimate knowledge of the background of the Constitution, gained as members of the Constitutional Convention of 1885, as well as a thorough knowledge of the law. In advising that the quoted language did not restrict the power of the state to discharge the liability by the issuance of bonds, the court said: "We think the subject of solicitude here was to protect the public-school fund, and not to prescribe the form by which the liability of the state to it should be evidenced. We think it might be by an interest-bearing bond of the state, if authorized by the legislature, 'in favor of the fund sustaining the loss'; or if the state could save money to itself by issuing and selling its bonds for the amount of the loss, and turning over the proceeds to the school fund, and thus make good the loss to it by placing it in precisely the condition it was before the loss, we can see no formidable constitutional objection to it."

Reflection indicates no reason which could have prompted the framers of the Constitution, and the people who adopted it, in in-

tentionally limiting and directing the manner in which a county should discharge its liability to these funds. It does not appear that benefit could accrue to either the funds or to the counties, by restricting repayment of losses to annual installments available from the common revenue. On the other hand, a favorable market might well permit a county to save itself a considerable sum, through the reduction of interest charges against it. We therefore conclude that the words "common revenue" were not used in the Constitution for that purpose, but were used for the purpose of emphasizing the intention to impose liability on the county. It is apparent that "The subject of solicitude here was to protect the public-school fund," and not to limit the manner in which losses should be paid. We therefore conclude that chapter 176 of the Laws of 1935 does not provide an exclusive method for the discharge of Stanley county's indebtedness to the educational funds of the state, and that it is permissible for said county to issue bonds for that purpose under chapter 77 of the Laws of 1937.

 May the Legislature impose liability on the counties for school funds apportioned to them to accrue upon the default of the principal?

The aggregate amount in which Stanley county deems itself indebted to the school and other educational funds divides itself into five classifications: (1) Funds invested in securities not in default as to principal or interest; (2) funds invested in securities on which default has occurred within the last two years; (3) funds invested in securities in default for more than two years, or foreclosed and deed taken; (4) a deficit not represented by either securities or funds on hand; (5) past-due interest.

It is obvious that the county not only has power, but is obligated, under the self-executing provisions of the Constitution, to pay over the amounts represented by the foregoing fourth and fifth classifications.

In the briefs, the defendants consent to an order restraining the payment of the amount represented by the first foregoing classification. Were it not so, such an order might well have issued, in any event, both by reason of the fact that no obligation has accrued, and because the county is without power to take over the securities represented in this classification.

The present inquiry concerns itself with the remainder of the funds, namely, that portion of the funds described by the third classification. By chapter 176 of the Laws of 1935, the Legislature in substance declares the counties to be indebted to these funds for the principal of any investment in default for more than two years. The Constitution, on the other hand, does no more than impose liability for loss. It is obvious that the funds have not suffered loss of the whole amount of any investment solely by reason of a two-year default. The real and actual loss suffered at such a time would be equal to the amount of the depreciation in the value of the security. The actual loss suffered to the funds through any investment would probably never be actually determined. until complete liquidation of the securities. When the situation is viewed from its practical aspects, however, in view of the fact that the Constitution renders the counties liable not only for loss but for the constant payment of interest upon the principal at a rate of not less than 5 per cent. per annum, it is apparent that there is almost exact equivalence between the practical result of these constitutional provisions and a provision which would impose liability for principal and interest from the moment of apportionment. Therefore, it appears that the legislative enactment in question and the similar legislative enactment of 1897, wherein the counties were required to take over real estate at foreclosure sales, imposed no burden on the counties in addition to that imposed by the Constitution.

However, if these provisions do impose burdens upon the counties which we are unable to perceive, the validity of the enactments is clear.

The Legislature exercises supreme power over the counties except in so far as it is restricted in the Constitution by express terms or by necessary implication. Stuart et al. v. Kirley et al., 12 S. D. 245, 81 N. W. 147, 150; Hersey v. Neilsen et al., 47 Mont. 132, 131 Pac. 30, Ann. Cas. 1914C, 963. In the case of Stuart et al. v. Kirley et al., supra, this court quoted with approval the language of Judge Cooley as follows: " 'The rule of law upon this subject appears to be that, except where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operates according to actual justice

or not in any particular case. The courts are not the guardians of the rights of the people of the state, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts cannot assume their rights. The judiciary can only arrest the execution of the statute when it conflicts with the constitution. It cannot run a race of opinions upon points of reason, right, and expediency with the lawmaking power. Any legislative act which does not encroach upon the powers apportioned to the other departments of the government, being prima facie valid, must be enforced, unless restrictions upon the legislative authority can be pointed out in the constitution, and the case shown to come within them.' Cooley, Const. Lim. p. 201."

The instant enactment is not only supported by this broad power of the Legislature over the counties, but by the express power granted to the Legislature by section 11 of article 8 of the Constitution to enact laws to "Carry out the objects and provisions of this section." We therefore conclude that the counties of this state are indebted to the permanent school and educational funds in an amount equal to the aggregate amount of all investments made by the counties which are in default and have been in default for a period of more than two years.

Because of the views herein expressed, other matters urged need not be considered.

An order may issue restraining the defendants C. H. Scott, Chas. Feezer, and Ben Horning, as members of and constituting the board of county commissioners of Stanley county, from issuing bonds for the purpose of funding an assumed obligation for that portion of the moneys heretofore apportioned to that county from the permanent school and other educational funds for investment and now invested in securities not in default for more than two years, and providing that no costs are to be taxed in this proceeding against either party.

RUDOLPH, P. J., and ROBERTS and WARREN, JJ., concur.

POLLEY, J., concurs in result.