MEIERHENRY, Justice.
[¶ 1.] The issue in this appeal is whether school districts have standing to seek a declaratory judgment against Auditor General Marty Guindon, Governor M. Michael Rounds, and Attorney General Lawrence Long (state officials) on the question of the constitutionality of K-12 public school funding in South Dakota. The circuit court determined that school districts did not have standing and granted summary judgment in favor of Guindon, Rounds, and Long. We reverse and remand.

*319
Procedural History

[¶2.] School district board members from Aberdeen, Andes Central, and Faulk-ton Area school districts[1] (school districts) filed the initial complaint for declaratory relief. The South Dakota Coalition of Schools (Coalition) joined the action as an intervenor. Formed in 1988 as the South Dakota Coalition of Small Schools, the Coalition is currently governed by a nine member board of school superintendents who work to advance the interests of member school districts. The Coalition is funded by dues paid by member school districts. In 2003, the Coalition was incorporated as a non-profit corporation. The Coalition employs attorneys to lobby the legislature and also employs expert-consultants and attorneys to represent the member school districts. The Coalition is a member of an organization that commissioned an adequacy study to determine the level of funding necessary to support South Dakota’s required education and learning standards.[2] The results of the study showed that education was seriously underfunded in South Dakota. On June 11, 2007, the school districts filed the original complaint for declaratory relief against the state officials in Hughes County. The complaint challenged the constitutionality of the funding of the K-12 education system in South Dakota. The Coalition joined the suit as an intervenor on June 25, 2007. The Coalition received funding from 96 of the 168 school districts in South Dakota, either in the form of dues or in direct support of the constitutional challenge.
[¶ 3.] In May 2007, Governor Rounds ordered Auditor General Guindon to determine the legality of the payments made by the school districts in support of the pending litigation. Attorney General Long concluded that the payment of funds by the school districts to the Coalition was illegal and requested the Auditor General to conduct an audit. The school districts and the Coalition challenged the Attorney General’s conclusion that the payment was illegal and brought an action for declaratory relief. The parties agreed to suspend the audit. Based upon an agreed stipulation of facts, the parties filed cross-motions for partial summary judgment pursuant to SDCL 15-6-56(b). The state officials claimed that the school districts did not have standing to sue the state officials. The school districts claimed that they did have standing to seek a declaratory judgment action; or alternatively, if they did not have standing, they had authority to expend school district monies to finance the litigation through the Coalition.
[¶ 4.] The circuit court ruled in favor of the state officials and entered a judgment declaring that the school districts lacked standing and did not have authority to finance the litigation. The school districts and the Coalition appeal the issue of whether the school districts have standing *320 to seek a judgment declaring the system of funding K-12 public education unconstitutional; or alternatively, whether the school districts can finance the lawsuit in the absence of standing. We hold that the school districts have standing. Standing is recognized here in the limited context of a declaratory judgment action and stems from provisions in the South Dakota Constitution.
[¶ 5.] The trial court denied standing based, in part, on prior cases decided by this Court. Edgemont Sch. Dist. 23-1 v. South Dakota Dep’t of Revenue, 1999 SD 48, 593 N.W.2d 36; Agar Sch. Dist. No. 58-1 v. McGee, 527 N.W.2d 282 (S.D.1995). In those cases, we held that the school districts did not have standing to challenge tax levies and distributions. In both cases, we determined that the districts were not the real parties in interest. In Agar School District, the district challenged the legality of an increased tax levy and its distribution to other school districts. 527 N.W.2d at 284. The case did not involve a constitutional challenge of any sort only a dispute over statutes. We determined that the district did not have standing because it could show no actual or threatened injury. Id. at 285. The district had received its requested funds for the school year, and the operation of the district had not been affected. Id. In Edgemont School District, the district challenged the constitutionality of a state law that set forth the methods of assessment and distribution of a statewide railroad tax. 1999 SD 48, ¶ 12, 593 N.W.2d at 39. We determined that the school districts lacked standing to challenge the constitutionality of state legislation. Id. ¶ 15. The rationale centered on the concept that school districts, like counties and municipalities, “are the creatures of the legislature.” Id. Generally, “ ‘[t]he creature is not greater than its creator, and may not question that power which brought it into existence and set the bounds of its capacities.’ ” Id. (quoting Bd. of Supervisors of Linn County, 263 N.W.2d 227, 232 (Iowa 1978)). We determined that “[n]one of the exceptions to this general rule regarding standing apply because the taxpayers within the district and county are the real parties in interest and can satisfy the traditional standing requirements.” Id. ¶ 16 (citing Agar Sch. Dist., 527 N.W.2d at 284).
[¶ 6.] The school districts and the Coalition assert that South Dakota’s K-12 public school funding system unconstitutionally underfunds education. The state officials claim that as creatures of the legislature, the school districts do not have standing to challenge the constitutionality of the funding system and that the real parties in interest are the parents and students. To establish standing, the school districts rely on provisions in the South Dakota Constitution that directly and expressly accord school districts rights to certain funds.

Standing under the South Dakota Constitution

[¶ 7.] Pursuant to the constitutional mandate “to establish and maintain a general and uniform system of public schools,” the South Dakota Legislature delegates to local school districts the authority to organize for the purpose of operating schools. See S.D. Const, art. VIII, § 1 (enabling legislation set forth in SDCL 13-5-1). In addition, the legislature gives local school boards “general charge, direction and management of the schools of the district and control and care of all property belonging to it.” SDCL 13-8-39.
[¶ 8.] The South Dakota Constitution creates and defines the system of public schools. S.D. Const, art. VIII, § 1 mandates the establishment of a “general and uniform system of public schools” as follows:
*321 The stability of a republican form of government depending on the morality and intelligence of the people, it shall be the duty of the Legislature to establish and maintain a general and uniform system of public schools wherein tuition shall be without charge, and equally open to all; and to adopt all suitable means to secure to the people the advantages and opportunities of education.
S.D. Const, art. VIII, § 1. The South Dakota Constitution specifies four sources of funding that go to the local school districts for public education. The first source is the interest from a permanent trust fund, whose principal derives from the sale of public school lands acquired from the United States government, property escheated to the State, gifts and donations, and other property “acquired for public schools.” S.D. Const, art. VIII, § 2. The constitutional provision provides for the permanent trust fund as follows:
All proceeds of the sale of public lands that have heretofore been or may hereafter be given by the United States for the use of public schools in the state; all such per centum as may be granted by the United States on the sales of public lands; the proceeds of all property that shall fall to the state by escheat; the proceeds of all gifts or donations to the state for public schools or not otherwise appropriated by the terms of the gift; and all property otherwise acquired for public schools, shall be and remain a perpetual fund for the maintenance of public schools in the state. It shall be deemed a trust fund held by the state. The principal shall never be diverted by legislative enactment for any other purpose, and may be increased; but, if any loss occurs through any unconstitutional act, the state shall make the loss good through a special appropriation.

Id.

[¶ 9.] S.D. Const, art. VIII, § 3 directs that the interest and income from the fund “be faithfully used and applied each year for the benefit of the public schools of the state” as follows:
The interest and income of this fund together with all other sums which may be added thereto by law, shall be faithfully used and applied each year for the benefit of the public schools of the state, and shall be for this purpose apportioned among and between all the several public school corporations of the state in proportion to the number of children in each[.]

Id.

[¶ 10.] Shortly after Article VIII had been approved by the voters, this Court in 1895 determined that the provision made the local school districts “the real owners of the [permanent trust] fund,” and the State a “constitutionally appointed trustee.” In re State Bonds, 7 S.D. 42, 63 N.W. 223, 226 (1895). We concluded that: “These funds do not belong to the state, but to the several school corporations. The state is simply a constitutionally appointed trustee, with the imposed duty of distributing to the real owners of the fund whatever of such moneys have been received by it....” Id.[3]
*322 [¶ 11.] In 1896 in State v. Ruth, this Court for the first time addressed the issue of sovereign immunity for state constitutional officials. 9 S.D. 84, 68 N.W. 189 (1896). While ascertaining that sovereign immunity did exist for discretionary tasks, the Court painstakingly distinguished the State’s legal status pertaining to the school trust funds found in Article VIII. Id. at 190. In regard to the school trust funds, the State’s legal status was that of a trustee not that of a sovereign:
The state appears in this action in its capacity of trustee, and must be treated as a natural person, acting in the same capacity; regard being had to the character of the trust, and the spirit of the constitutional provisions relating thereto. The rules which regulate ordinary trustees will need to be so applied as to secure and promote the ends contemplated by the constitution. It is the duty of each branch of the state government to regard the sacred character of this important trust, and to insist upon the utmost fidelity in its management.
Id. These earlier constitutional decisions have been subsequently viewed as particularly persuasive because those cases were decided by Justices who had been members of the Constitutional Convention of 1885 that drafted Article VIII. See Schomer v. Scott, 65 S.D. 353, 274 N.W. 556, 566 (1937). See also McDonald v. Sch. Bd. of Yankton, 90 S.D. 599, 246 N.W.2d 93, 97 (1976); Green v. Siegel, Barnett & Schutz, 1996 SD 146, ¶ 19 n. 10, 557 N.W.2d 396, 402 n. 10.
[¶ 12.] In 1937 in Schomer v. Scott, this Court made it clear that the school corporations were the beneficiaries of the permanent school trust fund. 65 S.D. 353, 274 N.W. 556 (1937). We said that “[u]nder the provisions of the Constitution, both the state and the county become trustees of the funds for the benefit of the school corporations of the state.” Id. at 561.[4]
[¶ 13.] The trustee/beneficiary relationship was examined for a fourth time in Schelle v. Foss, 76 S.D. 620, 83 N.W.2d 847 (1957). There, we held that because of the “sacred character of this important trust,” it was no ordinary trust but rather, as the duties were set forth in In re Bonds, Ruth and Schomer, the trust was for the benefit of “the school corporations of the state.” Id. at 851, 83 N.W.2d 847. The nature of the trust was defined as follows:
The framers of our Constitution intended to, and did, establish a special trust for the administration and preservation of our permanent school and educational funds. Article VIII of the Constitution serves as a trust instrument containing the declarations of trust. Its provisions are written in strong, clear, self-expressive language. Its beneficiaries are all of the public schools in the state together uñth its endowed charitable and educational institutions. The trust must be administered for their sole benefit and best interest. An involvement of the trust funds for any other purpose, consideration, or motivation would be in violation of the basic intendment of the trust.
Id. at 853, 83 N.W.2d 847 (emphasis added).
[¶ 14.] The Constitution establishes a second education funding source from “[t]he proceeds of all fines collected from violations of state laws[.]” S.D. Const, art. VIII, § 3. The county treasurers collect the fines and distribute them “among and *323 between all of the several public schools incorporated in such county in proportion to the number of children in each, of school age, as may be fixed by law.” Id. The Constitution also provides two other funding sources for public education — general taxation and local taxation. Article VIII, section 15 requires the legislature to “make such provision by general taxation and by authorizing the school corporations to levy such additional taxes as with the income from the permanent school fund shall secure a thorough and efficient system of common schools throughout the state.” S.D. Const, art. VIII, § 15.
[¶ 15.] The funding sources established by the Constitution go to the local school districts for the sole purpose of educating the children of South Dakota. Local school districts are the core of the entire K-12 educational system. The districts are beneficiaries of the permanent trust fund and designated recipients of the fines and taxes earmarked for education. Their position as beneficiaries and designated recipients is established by the South Dakota Constitution. Without adequate funding, the school districts claim they are unable to fulfill their mandate of educating the children of South Dakota. It is undisputed that public education is of utmost importance to the state and its citizens. South Dakota’s Constitution requires the legislature “to establish and maintain a general and uniform system of public schools ... and to adopt all suitable means to secure to the people the advantages and opportunities of education.” S.D. Const, art. VIII, § 1. The Constitution pronounces that a “general and uniform system of public schools” without tuition and “equally open to all” is important because “[t]he stability of a republican form of government depend[s] on the morality and intelligence of the people.” Id. Here, all the parties stipulated that “[e]ducation is a matter of great public importance in the State of South Dakota.” As the United States Supreme Court said in Brown v. Board of Education of Topelca, “education is perhaps the most important function of state and local governments.” 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) (emphasis added).
[¶ 16.] Unlike the prior cases of Agar and Edgemont, the districts and Coalition challenge the constitutionality of the overall system of funding of K-12 public education. The school districts’ interest in discharging their constitutional duty is not simply based on their status as representatives of constituent students and taxpayers. In this constitutional challenge, the school districts are not mere creatures of statute. Instead, they are creations of the Constitution via Article VIII. Because of the constitutional provisions and the vital position school districts hold as beneficiaries and recipients of public K-12 education funding, we recognize that school districts have standing to challenge the constitutionality of K-12 public school funding in the limited context of a declaratory judgment action. However, as counsel for the Coalition conceded during oral argument,
It would be up to the legislature and the executive branch to come up with a solution through the political process. The school funding litigation is not asking for a dollar. It asks for no relief other than declaratory relief and attempts to enforce declaratory relief if certain statutes have to be enjoined as unconstitutional.

Conclusion

[¶ 17.] Thus, we hold that in the narrow context of seeking a declaratory ruling on the constitutionality of K-12 public school funding that the districts have standing. Because we determine that the school districts have standing to sue the *324 state officials at this stage of the proceeding, it follows that the school districts also have authority to expend funds to support the litigation.
[¶ 18.] We reverse and remand.
[¶ 19.] GILBERTSON, Chief Justice, concurs with a writing and SABERS, Retired Justice, concurs.
[¶ 20.] KONENKAMP and ZINTER, Justices, concur in result.

. The school district board members of the three districts involved in the instant suit include: Brad Olson, Duane Aim, Michael Miller, Linda Burdette, Russell Gall, Merritt Stegmeier, Tommy Svatos, Terry Svatos, Deb-bra Houseman, John Brooks, Madeline Fast Horse, Karen Slunecka, Dawn Redden, Terry Aesoph, Heather Bode, and Grady Heitmann.

. The organization, the Alliance for Education commissioned the adequacy study to "tie resources to outcomes.” Other members of the Alliance include: the Associated School Boards of South Dakota (ASBSD), the School Administrators of South Dakota, the ESD Plus Six (a lobbying organization for school districts), and the Middle Schools Organization. The South Dakota adequacy study is available on the Alliance’s website. See Estimating the Cost of an Adequate Education in South Dakota, http://www.sdalliance foreducation.org/object/u/AdequacyStudy.pdf (last visited July 13, 2009).

. This doctrine first surfaced in the Constitutional Debates of 1885. The following was proposed by two delegates concerning what would become Article VIII.
Mr. Edgerton: "I would have the school fund beyond all possible control of the elections of the future state; if there is any fund that should [b]e sacredly set apart beyond a possibility of its being used for such purposes, it is the school fund.” At p. 500.
Mr. Kanouse: "The parties who hold this [school] fund, hold it nominally as a sacred trust and against the possibility of its being used for political purposes.” At pp. 515-516.

. At that time, Article VIII, section 11 authorized borrowing from the school funds for mortgages upon farm land. The counties assumed certain legal obligations to see that these funds were repaid. Such loan authority was removed by amendment of section 11 in 1952.