## *In re* STATE BONDS.

1. Act March 12, 1895, directing the issue and sale of state bonds to make good losses to the permanent school fund and to the interest and income funds, caused by the defalcation of the late state treasurer, is not repugnant to Const. art. 13, section 2, limiting the state's power to "contract debts."

2. Const. art. 8, sections 2, 13, provide that the state shall make good all losses to the perpetual school fund; and that losses caused by the defalcation or mismanagement of the officer controlling the fund shall be a permanent funded debt against the state, which shall not be counted as a part of the indebtedness to which the state is limited by Const. art. 13, sec. 2.

3. Article 8, sec. 3, declares that no part of the fund, "either principal or interest," shall be diverted from its purpose. *Held*, that the state must make good all losses to the interest and income funds as well as to the permanent fund, and for this purpose the legislature may authorize the issue of bonds.

(Opinion filed May 2, 1895.)

Application by the governor to the supreme court in the matter of the issue of state bonds.

Governor's Officer.

Pierre, South Dakota, April 24, 1895.

To the Honorable Judges of the Supreme Court of the State of South Dakota.

Gentlemen: The legislature of this state at its late session enacted a law, approved March 12, 1895, by which I am required, in connection with the state treasurer, to execute state bonds to the amount of $98,000, the proceeds of which are to be used to make good the losses to the permanent school and interest and income funds caused by the defalcation of the late state treasurer.

The execution of these bonds is a matter of great importance to the state and to myself in the discharge of my executive duties as governor, and hence I deem it proper to request your opinions as judges of the supreme court, under and by virtue of the provisions of section 13, art. 5, of the state constitution, upon the following question: Does said act conflict with the provisions of the constitution of this state?

I remain, yours truly,

C. H. SHELDON,
Governor of the State of South Dakota.

Supreme Court Chambers.

Pierre, S. D., May 2, 1895.

His Excellency, Charles H. Sheldon, Governor of the State of South Dakota.

Sir: We have the honor to acknowledge the receipt of your communication of April 24, 1895, requesting the opinions of the judges of the supreme court, under and by virtue of the provisions of section 13, art. 5, of the constitution of this state, as to whether or not the act passed by the legislature of this state at its late session, entitled "An act to authorize the treasurer of the state to issue bonds and apply the proceeds of the sale of the same to the payment of the loss of the permanent and interest and income school funds of this state occasioned by the defalcation of W. W. Taylor, late treasurer of the state of South Dakota," approved March 12, 1895, conflicts with the provisions of the constitution of this state, and to which we respectfully submit the following reply:

The preamble and act referred to by your excellency reads as follows:

"Whereas the permanent and interest and income school funds of this state have sustained a loss amounting to the sum of ninety-eight thousand four hundred and fifty-four and 28-100 dollars, occasioned by the defalcation of W. W. Taylor, late treasurer of the state, which amount has been audited by the proper author-

ities, and is a permanent funded debt against the state as provided in section 13 of article 8 of the constitution, therefore:

"Be it enacted," etc.:

"Section 1. That the state treasurer be, and he is hereby authorized and directed to issue and sell bonds of the state of South Dakota, in an amount sufficient to reimburse such funds and not exceeding the sum of ninety-eight thousand (98,000) dollars bearing interest at a rate not exceeding five per cent. per annum, payable semi-annually in the city of New York. Such bonds shall be executed by the governor and state treasurer and attested by the secretary of state under the great seal of the state, and shall run for a period not exceeding ten years; said bonds shall not be sold for less than par, and the proceeds thereof shall be applied to the payment of the aforesaid loss occasioned to the permanent and interest and income school funds of the state as aforesaid. The state board of assessment and equalization shall levy a tax annually sufficient to pay the interest upon said bonds as the same become due and provide for the payment of the principal thereof, upon the maturity of said bonds.

"Sec. 2. An emergency is hereby declared to exist and this act shall be in force and effect on and after its passage and approval.

"Approved March 12, 1895."

It will be observed that in the preamble both the permanent school fund and the interest and income funds are referred to, and that the act provides for reimbursing the losses to both the permanent and interest and income funds, by the issuance of state bonds in a sufficient amount to cover the losses sustained by the interest and income funds, as well as the loss sustained by the permanent school fund.

Two questions naturally present themselves for our consideration: First. Is the state authorized, by the provisions of the constitution, to make good the losses to the interest and income funds, as well as the loss to the perpetual or permanent school fund? Second. Is it competent for the legislature to make good

such losses to the perpetual and interest and income funds by the issuance of state bonds?

It is one of the fundamental rules applicable to the construction of an act of the state legislature that such act is presumed to be constitutional. A second rule equally fundamental is that a court will only declare an act of a state legislature unconstitutional, in whole or in part, when it is satisfied beyond a reasonable doubt that the act is in conflict with the state constitution. A reasonable doubt upon the question must be solved in favor of the legislative act, and the act sustained. See Cooley, Const. Lim. pp. 218, 219, and cases there cited. With these preliminary observations we proceed to the examination of the provisions of our state constitution bearing upon the questions presented. Section 1, art. 8, Const., imposes upon the legislature the duty of establishing and maintaining a general system of public schools. Section 2 designates and specifies what shall constitute the perpetual public school fund, and provides that such fund "shall be and remain a perpetual fund for the maintenance of the public schools in the state. It shall be deemed a trust fund held by the state. The principal shall forever remain inviolate; and may be increased, but shall never be diminishsd, and the state shall make good all losses thereof which may in any manner occur." Section 3 provides for the annual distribution of the interest and income from this fund, and concludes as follows: "And no part of the fund, either principle or interest shall ever be diverted, even temporarily, from this purpose, or used for any other purpose whatever than the maintenance of public schools for the equal benefit of all the people of the state." Section 7 designates and specifies from what sources the "perpetual funds" for the university, agricultural college, normal schools, and other educational and charitable institutions, shall be derived, and concludes as follows: "The interest and income of which, together with the rents of such lands as may remain unsold, shall be inviolably appropriated and applied to the specific objects of the original grants or gifts. The principal of every such fund may be increased, but shall never be

diminished, and the interest and income only shall be used. Every such fund shall be deemed a trust fund held by the state, and the state shall make good all losses therefrom that shall in any manner occur." Section 13, art. 8, of the state constitution, referred to in the preamble to the act in question, reads as follows: "All losses to the permanent school or other educational funds of this state which shall have been occasioned by the defalcation, negligence, mismanagement or fraud of the agents or officers controlling and managing the same, shall be audited by the proper authorities of the state. The amount so audited shall be a permanent funded debt against the state in favor of the fund sustaining the loss upon which not less than six per centum of annual interest shall be paid. The amount of the indebtedness so created shall not be counted as a part of the indebtedness mentioned in article 13, section 2."

If it were allowable to so construe this section 13 as to include the interest and income in the expression "the permanent school and other educational funds," losses to which are to be made good by the state under the requirement of section 2, there would seem to be no diffiulty in the way, except the apparent inconsistency between the provisions of section 2, that losses are to be made good by the state, and that of section 13, that such loss, when audited, shall be "a permanent funded debt against the state," which will be noticed later. That this section 13 was intended to cover losses of interest and income, as well as losses to the permanent school fund, seems to have been the theory of the legislature in the passage of this law; but we are inclined to think for reasons which will be briefly noticed in the course of this opinion, that such is not the proper meaning of that section. This same expression, "the permanent school and other educational funds," is several times used in this article 8, and as so used could not be meant to include interest and income, for the provisions referred to are entirely inconsistent with such meaning. The same expression having been used in other parts of this article with a well defined meaning, it ought to be presumed, in the ab-

sence of anything indicating a different intent, that it was used in the same sense in this section 13.

We think the obligation of the state to supply and make good all losses to the interest and income from such permanent fund springs from and is expressly devolved upon the state by section 3 of the same article. By that section the state is required each year to apportion and distribute such interest and income to the several public school corporations of the state. This is mandatory and the duty of the state to so distribute and pay over is not avoided by the fact that one of its officers has misappropriated such funds. If there were on hand, of interest and income, on the 15th day of June of any year, the date at which the apportionment should be made, the sum of $50,000, the duty of the state to pay over $50,000 was irrevocably fixed by the constitution, and the state could not be relieved of this duty on the ground that any officer to whom it had intrusted the custody of such funds had absconded with them. The liability of the state to pay or supply such loss would not constitute a contracted debt, within the meaning of the constitutional provision limiting the power of the state to "contract debts." If it would, then the state would be utterly absolved from the duty of distributing and paying over such interest in case of loss, or of making good such loss if the indebtedness of the state had already reached the maximum limit. The duty of the state to safely keep and duly distribute and pay over the school fund interest is just as clearly enjoined, and just as obligatory, as the duty to keep within the constitutional limitation of indebtedness. Both are imperative, and so we think it is not allowable to so read the constitution as to make it forbid the state to do a thing which it expressly requires it shall do. Our judgment is that the liability of the state to distribute the interest of the permanent school fund, being thus clearly inposed, is strictly binding, although a part or all of said interest moneys may have been missappropriated or lost by its immediate custodian, and that, as already intimated, such liability is not a debt, within the meaning of that provision of the constitution limiting the debt-

contracting power of the state. The moneys to be distributed and paid over are not general funds belonging the state, and which the legislature might have depleted by appropriations for other purposes. These funds do not belong to the state, but to the several school corporations. The state is simply a constitutionally appointed trustee, with the imposed duty of distributing to the real owners of the fund whatever of such moneys have been received by it up to the 15th day of June of each year. At no time does the state owe these interest moneys to the school corporations. The relation of the state to the school corportions is not that of debtor, but rather that of a bailee of a special deposit. It may be suggested that the same is true as to the permanent fund or principal, but the constitution itself answers this suggestion, by expressly providing that, in case of loss to the permanent fund, the state may and must substitute its own promise to pay to the extent of such loss. So understood, section 13, which requires the loss to "the permanent school or other educational funds" to be audited and remain "a permanent funded debt against the state," has no application to losses to the interest and income therefrom, which the state is required to distribute annually. It looks to us to be out of harmony with the entire plan of the constitutional article creating these two permanent funds, the public school fund by section 2, and the other educational fund for maintenance of state institutions by section 7, the interest of which only, in either case, can be used, to say that a loss from such interest moneys, which ought to be appropriated and paid out each year for the current support of the public schools, must be audited, and then become a "permanent funded debt," upon which the state shall only pay interest. This would deprive the public schools of the apportionment for the current year, upon which they had a right to and had depended. By the constitution, the schools are entitled yearly to the whole of this income, and not simply to the interest on it.

This much having been said as to the liability of the state to repair the loss to the interest and income from the permanent

school fund, it will be noticed that the constitution expressly and in unequivocal terms requires the state to make good all losses to the principal or permanent school fund "which shall have been occasioned by the defalcation, negligence, or mismanagement or fraud of the agents or officers controlling and managing the same"; and it is then specifically provided that the amount of the indebtedness so created shall not be counted as a part of the indebtedness to which the state is limited. It may not seem plain how the liability to repair the loss to the permanent fund is an indebtedness, while the liability to replace the interest moneys so lost is not. This reason for the distinction is this: In the one case the loss is to be a permanent fund, which is always to remain as an interest-bearing principal, and, in case of loss to it, the state is required to put in the place of such loss its own promise to pay, upon which it shall pay interest. In the other case the state is required, not to promise or undertake anything executory, but is required actually to pay over the interest money precisely as no loss had occurred.

The second question is, may the state legally issue bonds as provided by law under consideration, for the loss to either the permanent school fund, or of moneys collected as interest therefrom, or both? In this respect the state may do whatever is not forbidden by its organic law. As already seen, the limitation of state indebtedness does not apply, in respect to the duty of the state as to either. The provision in section 13, that the amount of the loss to the permanent fund, being properly audited, "shall be a permanent funded debt against the state," might be taken as definitely and unalterably fixing the form in which such indebtedness should be carried, and the exact relation of the state to it; but the particular thought of the constitution was, not so much to prescribe a form of security, as to definitely and unequivocally declare the continuing and inevitable liability of the state to make the loss to the principal good, and to pay interest on the same until it was so made good. It was to be a permanent and continuing, but not a perpetual, inextinguishable, debt against the

state. If so, it could not be a funded debt. A funded debt, is one
for the payment of the interest of which, and the ultimate discharge
of the principal, provision is made. Railroad Co. v. Dudley, 14 N.
Y. 336, and text books cited. We think the subject of solicitude
here was to protect the public-school fund, and not to prescribe
the form by which the liability of the state to it should be evi-
denced. We think it might be by an interest-bearing bond of the
state, if authorized by the legislature, "in favor of the fund sus-
taining the loss"; or if the state could save money to itself by is-
suing and selling its bonds for the amount of the loss, and turn-
ing over the proceeds to the school fund, and thus make good the
loss to it by placing it in precisely the condition it was before the
loss, we can see no formidable constitutional objection to it, and
this is what the submitted law proposes.

This still leaves the question of the power of the legislature
to issue bonds covering the loss of the interest moneys. As we
have attempted to show, the state was constitutionally bound to
apportion and distribute these moneys for this current year. It
was not to do this if convenient, or if it had the moneys on hand,
but it was to do it unconditionally and absolutely, and, if the leg-
islature should officially know that for any reason this would not
be done without action on its part, it was its duty to take such ac-
tion as would insure its being done. The duty to do so being
constitutionally imposed, from which there was no escape, the ex-
ecution of such duty included the use of the means necessary for
its accomplishment. It thus became simply a legislative question
of how the state should be put in condition to obey the imperative
mandate of the constitution. If the state had no other way of
meeting this definite requirement of the constitution, as the case
seems to be, than by supplying itself with funds by the issue of
bonds, we do not think the general debt-limiting provision of the
constitution forbade the use of such means; for, as already said,
the requirement to pay over the interest moneys, whether they
had been safely preserved or not, was just as imperious and bind-
ing upon the state as the requirement that it should keep its in-

debtedness within the constitutional limitation. It might be suggested that this was a proper subject for a deficiency tax, but a deficiency levy, if allowable, would not meet the emergency. A deficiency levy is to provide for a deficit in the preceding year. There was no such deficit here. It is, moreover, doubtful if a deficiency levy is ever allowable, except when the "ordinary expenses" of the state have exceeded its income (Const. art. 11, sec. 1), and this is not such a case. While the question which you submit to us is not so free from difficulty or doubt as we wish it were, we resolve the doubt in favor of the law, and advise you that the same is not invalid because repugnant to the constitution.

We have the honor to be your obedient servants.

DIGHTON CORSON,
A. G. KELLAM,
H. G. FULLER,
Judges Supreme Court, South Dakota.