SCHELLE, Plaintiff v. FOSS et al., Defendants

(83 N.W.2d 847)

(File No. 9666. Opinion filed June 25, 1957)

M. Q. Sharpe, John W. Larson, Kennebec, for Plaintiff.

Phil Saunders, Atty. Gen., Benj. D. Mintener, Asst. Atty. Gen., for Defendants.

G. J. Danforth, Jr., Danforth & Danforth, Sioux Falls, Amici Curiae.

HANSON, J. The plaintiff seeks a writ of 'prohibition to prevent the defendants from further proceeding with a proposed plan involving the sale and reinvestment of securities belonging to the permanent school funds. The plaintiff is a citizen and taxpayer and brings this action on behalf of himself and all others similarly situated. The defendants are members of the State Board of School and Public Lands, members of the State Board of Finance, the Commissioner of School and Public Lands and the Governor. Because of manifest public concern, this court has assumed original jurisdiction.

The permanent school and educational funds of the state now total, in the aggregate, over $34,000,000. The Commissioner of School and Public Lands is charged with the duty of investing this money, subject to the approval or supervisory control of the Governor, the Board of School and Public Lands and the State Finance Board.

The moneys belonging to the permanent school fund can only be invested in "bonds of the United States, securities guaranteed by the United States, bonds of the State of South Dakota, or in bonds of any school corporation, organized county, or incorporated city within the State of South Dakota and at such rates of interest as the Legislature shall, from time to time, determine." Art. VIII, § 11 of the Constitution. Pursuant thereto over $30,000,000 of such funds are now invested in United States Government bonds. In recent years few loans have been made to local political

subdivisions as they have been able to obtain money from private investors at lower interest rates than the 3% required on school fund loans. Consequently, the school funds were of necessity largely invested in bonds of the United States.

During the past year the prevailing policy of easy money and low interest rates has been supplanted by the trend to tight money and higher interest rates. The 3% permanent school fund money therefore became attractive to the local political subdivisions. The numerous demands for such loans greatly exceed the available funds on hand for investment. On the expectation of receiving 3% loans from the permanent school fund local subdivisions of the state have approved bond issues totaling over nine million dollars for the construction of new schools and other public buildings. A few even have commenced actual construction in anticipation of such loans. To alleviate their condition the Commissioner of School and Public Lands now proposes to immediately sell approximately $13,000,000 worth of Government bonds belonging to the school funds and bearing interest at 2½% and 2¾%. The bonds will have to be sold at a discount of 7¢ to 9¢ on the dollar. Over nine million dollars of the proceeds would be reinvested in local bonds bearing 3% interest. The balance would be reinvested in local bonds bearing 4% interest and in Federal Housing Administration bonds bearing 4-4½% interest which may now be purchased at a discount. The Commissioner's plan of sale and reinvestment has been duly approved by the Board of School and Public Lands, by the Governor, and by the Board of Finance. Unless prohibited by this court the proposed plan will be effectuated.

It is conceded the sale and conversion of the United States bonds at a discount will deplete the permanent school funds to the extent of the discount. Defendants' proposal contemplates selling Series G Bonds having a face value of $1,955,000 at the current market value of approximately $1,911,434, which will result in a total discount of $43,566 of which $12,325 would be charged to the common school fund and the balance of $31,241 would be charged to the other endowed funds. It is also proposed to immediately convert non-negotiable Series B Bonds having a face value of

$11,000,000 which will result in a discount of at least $880,000, all of which discount would be chargeable to the common school fund. A larger sale or conversion of Series B Bonds would, of course, result in a greater depletion of the principal funds. The Series B Bonds are long-term bonds callable in 1975 and maturing in 1980, while the Series G Bonds are callable in successive years with the final bonds maturing in 1962.

The defendants further propose to restore the resulting "depletion" to the corpus of the permanent school funds in the following manner: (1) The $12,325 loss resulting from the sale of Series G Bonds to be restored to the common school fund by allocating a similar amount of face value Federal Housing Administration insured mortgages now invested in the common school fund and representing a face value in excess of their actual purchase price; and (2) the discount on the sale of Series G Bonds resulting to the other endowed funds to be restored by transferring the amount of such discount forthwith from the interest and income funds of such endowed institutions to the permanent fund account of such institutions, and (3) the loss resulting from the conversion of long-term United States Series B Bonds be restored by purchasing Federal Housing Administration insured mortgages at a discount of approximately 6% on the dollar and the balance of the discount be amortized over the necessary period of years by crediting the common school permanent fund with the total increase in earnings occasioned by the entire transaction, or by the immediate transfer from the common school interest and income fund of an amount not in excess of premiums heretofore secured on the sale of securities above their cost or the purchase of securities below the face value.

The defendants estimate the depletion in the permanent school funds will be completely restored in a matter of five or six years. Thereafter during the normal life of the reinvestments the interest and income funds will gain approximately $1,500,000 over the rate on the bonds proposed to be sold.

The plaintiff does not question the meritorious motives of the defendants. He concedes they are well intentioned

and are acting in good faith. He does, however, challenge their legal and constitutional authority to proceed on the following grounds: (1) The sale and conversion of United States bonds at a discount will result in a loss and diminution of permanent school funds contrary to the provisions of Sections 2 and 7 of Article VIII of the State Constitution; and (2) that to transfer at face value securities purchased at a discount, or to transfer cash from the interest and income funds to the permanent funds would constitute an unlawful diversion of interest and income contrary to the provisions of Sections 3 and 7 of Article VIII of the Constitution; and (3) there is no statutory authorization permitting the defendants to sell, exchange, convert, negotiate, or otherwise dispose of securities legally invested prior to maturity.

The defendants' assertions may be summarized as follows:

(1) The state as trustee of the permanent school funds must be treated as any other trustee and the rules of law regulating ordinary trusts apply;

(2) There is no law or constitutional provision prohibiting the sale of securities belonging to the permanent school fund and, therefore, they have discretionary power and authority to do so, and

(3) The 1952 amendment to Section 11, Article VIII of the Constitution directing the investment of the permanent educational funds so as "to provide the highest income compatible with safe investment" must prevail over the previous constitutional provisions in case a strict compliance therewith nullifies the apparent intent of the latter amendment.

The primary question presented is whether or not the defendant officials have the express or implied authority to voluntarily sell invested securities belonging to the permanent school fund at a loss. The answer rests almost entirely on the application and interpretation of our own statutory and constitutional provisions. Few helpful authorities from other jurisdictions have been found or presented.

The pertinent portions of our constitutional provisions are all found in Article VIII thereof, as follows:

§ 2. "All proceeds of the sale of public lands that have heretofore been or may hereafter be given by the United States for the use of public schools in the state; all such per centum as may be granted by the United States on the sales of public lands; the proceeds of all property that shall fall to the state by escheat; the proceeds of all gifts or donations to the state for public schools or not otherwise appropriated by the terms of the gift; and all property otherwise acquired for public schools, shall be and remain a perpetual fund for the maintenance of public schools in the state. It shall be deemed a trust fund held by the state. The principal shall forever remain inviolate, and may be increased, but shall never be diminished, and the state shall make good all losses thereof which may in any manner occur."

§ 3. "The interest and income of this fund, together with all other sums which may be added thereto by law, shall be faithfully used and applied each year for the benefit of the public schools of the state, and shall be for this purpose apportioned among and between all the several public school corporations of the state in proportion to the number of children in each, of school age, as may be fixed by law; and no part of the fund, either principal or interest, shall ever be diverted, even temporarily, from this purpose or used for any other purpose whatever than the maintenance of public schools for the equal benefit of all the people of the state."

§ 7. "All lands, money or other property donated, granted or received from the United States or any other source for a university, agricultural college, normal schools or other educational or charitable institution or purpose, and the proceeds of all such lands and other property so received from any source, shall be and remain perpetual funds, the interest and income of which, together with the rents of all such lands as may remain unsold, shall be inviolably appropriated and applied to the specific objects of the original grants or gifts. The principal of every such fund may be increased, but shall never be diminished, and the interest and income only shall be used. Every such fund shall be deemed a trust fund held by the state, and the state shall make good all losses therefrom that shall in any manner occur."

§ 11. (as amended in 1952). "The moneys of the permanent school and other educational funds shall be invested by the Commissioner of School and Public Lands only in bonds of the United States, securities guaranteed by the United States, bonds of the State of South Dakota, or in bonds of any school corporation, organized county, or incorporated city within the State of South Dakota and at such rates of interest as the Legislature shall, from time to time, determine.

"The Legislature shall provide by law, such rules, regulations and safeguards as it may deem necessary to secure safe and continuous investment of such funds as far as possible, and to provide the highest income compatible with safe investment."

§ 12. "The governor may disapprove any sale, lease or investment other than such as are intrusted to the counties."

§ 13. "All losses to the permanent school or other educational funds of this state which shall have been occasioned by the defalcation, negligence, mismanagement or fraud of the agents or officers controlling and managing the same, shall be audited by the proper authorities of the state. The amount so audited shall be a permanent funded debt against the state in favor of the fund sustaining the loss upon which not less than six per centum of annual interest shall be paid. The amount of indebtedness so created shall not be counted as a part of the indebtedness mentioned in article XIII, section 2."

Admittedly the state is the constitutionally delegated trustee of the permanent school funds. It must, of course, act by and through its duly elected and appointed officials. That it is no ordinary trust seems settled. The nature of the trust was first described by this court in the case of State v. Ruth, 9 S.D. 84, 68 N.W. 189, 190, as follows: "The state appears in this action in its capacity of trustee, and must be treated as a natural person, acting in the same capacity; regard being had to the character of the trust, and the spirit of the constitutional provisions relating thereto. The rules which regulate ordinary trustees will need to be so applied as to secure and promote the ends contemplated by the constitution. It is the duty of each branch of the state government to regard the sacred character of this important

trust, and to insist upon the utmost fidelity in its management." In the more recent case of Schomer v. Scott, 65 S.D. 353, 274 N.W. 556, 561, the court was concerned with the liability of the counties to the school fund under Section 11, Article VIII of the Constitution before its amendment. The counties were there asserting they were liable to the fund as ordinary trustees and therefore no liability accrued as to them until it was first shown that a county had violated its trust. The court said of this assertion: "There is no significance in the use of the word 'trust' in connection with the relation of the county to these funds other or different than flows from the use of the same term in describing the relation of the state to the identical funds. Under the provisions of the Constitution, both the state and the county become trustees of the funds for the benefit of the school corporations of the state. If this word limits liability in the one instance, it must perform a like function in the other. To hold that the state and counties were no more than mere trustees of these funds, would remove the keystone of the arch through which its designers intended to supply these funds with perpetual support." The status of the state, as trustee of these funds, remains the same today.

In considering a similar question in the case of Parsons v. Diefendorf, 53 Idaho 219, 23 P.2d 236, 238, the Idaho court held the Commissioner of Public Investments had no implied authority to sell authorized securities purchased with permanent school funds and that such funds could only be reinvested on payment of securities originally purchased. Without doubt the court's decision denying the Commissioner power to reinvest funds before payment was based somewhat on a statute providing "upon the payment of any loan or of any bond or warrant, the principal shall again be loaned or invested in like manner." I.C.A. § 55-704. However, the question of implied authority was based on an overall consideration of the constitutional and statutory provisions of Idaho. In this regard the decision is particularly applicable to our constitutional and statutory provisions. The court stated:

"The state treasurer has the custody of the fund. The commissioner of public investments has

the limited and restricted authority to invest the fund in the specific, designated constitutional and statutory securities and the care and custody of such securities when so invested, and the authority to collect and receive payment thereof when paid, but has no authority, express or implied, to exchange, to sell, to hypothecate, or under any circumstances to change or modify said investments when once made, except upon payment thereof, and except as hereinafter mentioned.

"The trust created by the Constitution and laws of this state is a fixed trust, in no sense a speculative trust or a trust that can be used for speculative purposes, however advantageous a change in investments may appear."

As authority for the sale of bonds at a discount the defendants cite, and place considerable emphasis on, the North Dakota case of Moses v. Baker, 71 N.D. 140, 299 N.W. 315, approving the purchase of securities above par value as a proper investment of permanent school funds. The North Dakota constitution provides "that if any portion of the interest or income aforesaid be not expended during any year, said portion shall be added to and become a part of the school fund." Article IX, Section 154, N.D. Constitution. Our constitution requires the annual apportionment of all interest and income from such funds. Article VIII, Section 2. The North Dakota constitution further provides that the Board of University and School Lands shall have control of the appraisement, sale, rental and disposal of all school and university lands and "shall direct the investment of the funds arising therefrom". Article I§, Section 156. This provision has been interpreted by the North Dakota court as vesting the Board of University and School Lands with a discretion in the performance of its duties. Fuller v. Board of University and School Lands, 21 N.D. 212, 129 N.W. 1029. Our constitution grants no such discretionary authority. Article VIII, Section 11.

The Nebraska court also approved of the payment of a premium in making an investment of school fund money "when the market value of the security purchased justifies and requires it, * * * and does in no sense violate the constitutional provision that this fund 'shall remain forever

inviolate and undiminished.'" In re School Fund, 15 Neb. 684, 50 N.W. 272, 273. In the same case, however, the Nebraska court refused to approve of the sale, or exchange of school fund investments, once made.

■■ Aside from any consideration of constitutional and statutory differences existing in our state and the states of Nebraska and North Dakota, we believe the sale of school fund securities at a discount involves an entirely different principle than the purchase of such securities at a premium. The payment of a premium arises out of necessity in order to keep trust funds invested. The premium paid merely adds to the net cost of the investment thereby reducing the net income to be realized thereon. The voluntary sale of invested securities at a loss, on the other hand, is proposed by the defendants solely in anticipation of greater returns on the investment. There is no assurance of such eventuality. Furthermore, the sale at discount will necessarily result in depleting the principal funds which can only be restored, in this case, by an unlawful diversion of interest and income. Article VIII, Section 3 of the Constitution; In re State Bonds, 7 S.D. 42, 63 N.W. 223.

The framers of our Constitution intended to, and did, establish a special trust for the administration and preservation of our permanent school and educational funds. Article VIII of the Constitution serves as the trust instrument containing the declarations of trust. Its provisions are written in strong, clear, self-expressive language. Its beneficiaries are all of the public schools in the state together with its endowed charitable and educational institutions. The trust must be administered for their sole benefit and best interest. An involvement of the trust funds for any other purpose, consideration, or motivation would be in violation of the basic intendment of the trust. This fundamental principle is violated by the proposal to sell United States bonds, at a loss, for the sole purpose of providing money to reinvest in local bonds bearing 3% interest. Over nine million dollars in United States bonds would thus have to be sold at an estimated discount of 9%. The principal funds would thereby be depleted to the extent of the discount. Furthermore, the school funds would also suffer a loss of interest and

income. The full amount of principal presently invested in United States bonds bearing interest at 2¾% provides a higher net return than the depleted principal would return invested in local bonds bearing 3% interest.

■ We cannot read into the 1952 amendment to Section 11, Article VIII of the Constitution the implications therefrom assumed by the Commissioner of School and Public Lands. By the amendment the counties are relieved of the burden of investing permanent school funds. It imposes that limited duty on the Commissioner of School and Public Lands subject, however, to legislative direction and control. It amends Section 11 only. "Upon the adoption of an amendment to a constitution, the amendment becomes a part thereof; as much so as if it had been originally incorporated in the constitution; and it is to be construed accordingly. If possible, it must be harmonized with all the other provisions of the constitution. If this cannot be done the amendment will prevail." Vol. 1, Cooley's Constitutional Limitations, Chap. 4, Page 129. We find no difficulty in harmonizing the amendment with all the other provisions of the Constitution. In no manner does it weaken, override or nullify any other provision in Article VIII. All of its provisions can be accorded their full force and effect. The first paragraph of the amendment simply directs that **"The moneys** of the permanent school and other educational funds **shall be invested by the Commissioner** of School and Public Lands **only in bonds** of the United States" and other described securities. That portion of the amendment is self-executing merely to the extent of authorizing the Commissioner to "invest" moneys belonging to the permanent school funds in certain prescribed securities. It does not authorize him to "direct the investment of the funds" in the words of the North Dakota Constitution, or to "invest and manage" or to "invest and supervise" nor does it contain any other words of discretionary import whereby authority to "invest and sell" school fund securities is implied.

The concluding paragraph of the 1952 amendment to Section 11, Article VIII, is not self-executing to any extent. It authorizes legislative action only: "The Legislature shall provide by law, such rules, regulations and safeguards

as it may deem necessary to secure safe and continuous investment of such funds as far as possible, and to provide the highest income compatible with safe investment." By its terms the Commissioner of School and Public Lands acquires no power, express or implied, whatsoever. It merely authorizes legislative action in accord with all the other provisions of Article VIII of our Constitution. We are certain the people did not intend by such amendment to convert the permanent school fund into a trust administered by officials having wide discretionary authority. In establishing the permanent school fund the framers of our Constitution were primarily concerned with the safe continuous investment of the corpus of such funds. The highest return on that investment was a subordinate consideration. We believe the perpetuation of the fund to be the dominant concern of the people today.

We, furthermore, cannot escape the conclusion that the voluntary sale of invested securities belonging to the permanent school funds at a discount would be an unconstitutional assumption of power. Such sales would constitute an unlawful diminishment of the principal of the funds contrary to the provisions of our Constitution that such money "shall be and remain a perpetual fund * * *. The principal shall forever remain inviolate, and may be increased, but shall never be diminished * * *." Such language does not sanction degrees or periods of diminishment.

For the foregoing reasons the writ of prohibition must be granted. It is accordingly unnecessary to consider other questions presented. No costs will be taxed.

All the Judges concur.