Gary MERKWAN, Applicant,

v.

STATE of South Dakota, By and Through its Governor, William J. JANKLOW, Sheldon Cotton, Commissioner of School and Public Lands, Respondents.

No. 15010.

Supreme Court of South Dakota.

Considered on Briefs July 31, 1985.

Decided Oct. 9, 1985.

Celia Miner of Brady, Kabeiseman, Reade & Johnson, Yankton, for applicant.

Mark V. Meierhenry, Atty. Gen., Pierre, for respondents.

MORGAN, Justice.

This case was brought by petition to commence an original action seeking (1) a declaratory judgment that S. 310 60th Sess.

(1985) (SB 310/85) is unconstitutional; and (2) a writ of prohibition to prevent the Governor and the Commissioner of School and Public Lands from taking action to combine the Springfield Trust assets with the normal schools of South Dakota lands permanent fund and interest and income fund as authorized in that legislation. An alternative writ of prohibition was issued and the State responded with a motion to quash. We grant the State's motion, quash the alternative writ and deny the prayer for peremptory writ.

This case is another offshoot of the 1984 legislature's decision to close the University of South Dakota/Springfield (USD/S) and transfer it to the Board of Charities and Corrections for use as a minimum security prison. The first action challenged the constitutionality of S. 221 59th Sess. (1984) (SB 221/1984) as violative of the provisions for the Permanent Trust Fund created by the Enabling Act (Ch. 180, 25 Stat. 676) and the South Dakota Constitution, Article VIII, § 7, as well as several other constitutional challenges not pertinent here. On the issue of the trust funds, our decision, *Kanaly v. State*, 368 N.W.2d 819 (S.D.1985), filed May 29, 1985, held SB 221/1984 to be unconstitutional, absent action by the legislature to reimburse the trust fund for the full market value of all property and interests transferred to the Board of Charities and Corrections. We remanded the case to the trial court to determine the full and true value and gave the legislature through the 1986 Session to provide for reimbursement.

Meanwhile, the 1985 Legislature enacted SB 310/1985, which provided in essence: (1) transferred USD/S trust land and funds to other state normal schools and funds; and (2) realigned the proportionate share of mineral lease money from school lands as provided in SDCL 5-7-34, deleting USD/S from the proration schedule and adding the previous USD/S share to those of three other schools.

Merkwan first challenges the validity of section 1 of SB 310/1985 as violative of the provisions of the Enabling Act, the South Dakota Constitution, and our decision in *Kanaly, supra.* More particularly, it is his contention that all of the foregoing mandate that the 40,000 acres of trust land (or so much as remains unsold) and all other assets designated as part of the USD/S Trust must be held, accounted for and used as the USD/S Trust, in perpetuity. We disagree.

We examined the history of the USD/S trust lands in *Kanaly*, vis-a-vis, the Enabling Act, the South Dakota Constitution, and Chapter 163 of the Session Laws of 1895. We will avoid repetition of that discussion as much as possible. The issues before us now are tangential to the trust issue in *Kanaly*. They could not have been raised then, of course, because the legislation had not been enacted. The antithesis of that statement is that *Kanaly* was decided on the basis of the law, i.e., the Enabling Act, the Constitution, and the statutes, as they were at the time of that decision.

We examine Merkwan's contention in the light of the pertinent language of the Enabling Act, the Constitution, and Chapter 163 of the Session Laws of 1895. Section 17 of the Enabling Act, adopted by Congress in 1889, provided some 330,000 acres for various state institutions, to-wit: for the school of mines, for the reform school, for the deaf and dumb asylum, for the agricultural college, for the university, for the state normal school, and for public buildings at the capitol. It also granted 170,000 acres "for such other educational and charitable purposes as the Legislature of said state may determine[.]" Section 17 further provided that "the lands so granted ... shall be held, appropriated and disposed of for the purposes herein mentioned, in such manner as the Legislature ... may determine[.]" Section 11 of the Enabling Act also provided: "With exception of the lands granted for public buildings, the proceeds from the sale and other permanent disposition of any of said lands, or from every part thereof, shall constitute permanent funds for the support and maintenance of the public schools and the vari-

ous state institutions for which the lands have been granted."

At the time of the enactment of the Enabling Act there were three schools situated in the confines of the territory designated to be South Dakota that had been established by the territorial legislature to be normal schools, to-wit: Spearfish Normal School (1883), Dakota Normal School at Madison (1881), and Southern Normal School at Springfield (1881). The record reflects that the grant "for state normal school, 80,000 acres" was shared by Black Hills State College and Dakota State College. None of those acres were allocated to USD/S.

In 1895, the legislature enacted Chapter 163, entitled Appropriating Land For The Springfield Normal School. Chapter 163, after acknowledging the founding of the territorial normal school at Springfield in 1881, referred to the provisions of the Enabling Act ceding 500,000 acres to the state for maintenance of various educational institutions, specified that there remained 170,000 acres of said land unappropriated and thence provided for appropriation for support and maintenance of the state normal school at Springfield, 40,000 acres out of any lands donated to the State by the United States and not otherwise appropriated.

The enactment further provided: "All moneys received from the rent of the lands mentioned in this act, and all interest received from the investment of the proceeds of the sales of said lands shall be applied to the support and maintenance of said normal school at Springfield."

The Enabling Act does not refer to specific institutions by location nor by statutorily established names, but rather by academic and charitable pursuits, *e.g.*, agricultural college, university, deaf and dumb asylum, state normal school, although specific institutions had been previously founded by actions of the territorial legislature, *e.g.*, Dakota School of Mines, University at Vermillion, Agricultural College at Brookings, State School for the Deaf at Sioux Falls, and the three normal schools previ-

ously referred to. It is also noteworthy that although twice as many acres are granted to state normal school as to the other schools, normal school is designated in the singular.

The South Dakota Constitution, Article VIII, § 7, adopted October 1, 1889, in pertinent part, provides: "All lands ... granted or received from the United States ... and the proceeds of all such lands ... shall be and remain perpetual funds, the interest and income of which ... shall be inviolably appropriated and applied to the specific objects of the original grants...."

The framers of our Constitution intended to, and did, establish a special trust for the administration and preservation of our permanent school and educational funds. Article VIII of the Constitution serves as the trust instrument containing the declarations of trust. Its provisions are written in strong, clear, self-expressive language. Its beneficiaries are all of the public schools in the state together with its endowed charitable and educational institutions. The trust must be administered for their sole benefit and best interest. An involvement of the trust funds for any other purpose, consideration, or motivation would be in violation of the basic intendment of the trust.

*Schelle v. Foss,* 76 S.D. 620, 629, 83 N.W.2d 847, 853 (1957).

SDCL 2–14–1 directs us that words used in a statute are to be understood in their ordinary sense. We have so held in *Oahe Conservancy Subdistrict v. Janklow,* 308 N.W.2d 559 (S.D.1981). In *S.D. Auto Club v. Volk,* 305 N.W.2d 693, 697 (S.D.1981), we said: "Generally speaking, principles of construction applicable to statutes, are also applicable to constitutions, but not to the extent of defeating the purposes for which a constitution is drawn." (citation omitted)

Looking then at the specific object of the original grant from which the USD/S land was obtained, as contained in the Enabling Act, it is clearly and broadly stated as educational and charitable purposes, as the legislatures may determine. Both the En-

abling Act and Article VIII, § 7, refer to "institutions for which granted" or "objects of the original grant." The Enabling Act vests certain authority in the legislatures: "[I]n such manner as the legislature may provide."

The object of a statute as defined in Black's Law Dictionary is the aim or purpose of its enactment, the end or aim which it is meant to accomplish, while the subject is the matter to which it relates and with which it deals. Black's Law Dictionary, Rev. 4th Ed. p. 1222.

Congress did not designate any specific existing institutions by name in any of the grants; at the time of the grants there were three existing normal schools in the area comprising the new state of South Dakota. The 1895 State Legislature appropriated the 40,000 acres from acres not otherwise appropriated. The 1895 Legislature deemed it necessary to include a direction for the use of rents and sale proceeds from the lands for the support of the institution, which would otherwise be redundant. The Constitution refers to "objects of the original grant" not to "subjects of the original grant."

The issue resolves down to this question: Is the constitutional designation of "a perpetual fund inviolably appropriated to the specific objects of the original grant" offended by SB 310/1985? Because of the wording, "the specific objects of the original grant," we hold that it is not.

■ We hold it to be too narrow a reading of the plain language of the Enabling Act and the Constitution to say that the 1985 Legislature could not amend or supersede its previous action in 1895 by enactment of SB 310/1985, and thereby divert the trust assets from a nonexistent institution to the other existing state normal schools, all of them clearly falling within the category of educational institutions as denominated in the original grant.

The general trust in effect under Article VIII, South Dakota Constitution, extends to all permanent school and educational land and funds. More specifically, in this case, it involves the 170,000-acre grant for the object of educational and charitable purposes. SB 310/1985 does not violate that purpose.

■ We next examine Merkwan's contention that SB 310/1985 violates the language of *Kanaly, supra.* We disagree. First of all, under the doctrine of the separation of powers our decisions are subject to change by legislative action so long as such legislation is not unconstitutional on its own merits. One of the more recent dramatic examples is the legislative action to nullify our decision in *Walz v. City of Hudson,* 327 N.W.2d 120 (S.D.1982), wherein we held bartenders and bar owners liable for injuries to third parties caused by intoxicated patrons. *See* SDCL 35–4–78. In the case before us, SB 310/1985 was not a response to *Kanaly,* it was enacted before the decision came out. Nevertheless, the statutory change can and would overrule any language to the contrary in *Kanaly* since, as we have above pointed out, it would not be unconstitutional.

But we do not agree that the decision renders SB 310/1985 unconstitutional. The language in *Kanaly* that Merkwan seizes upon is as follows:

> The trust and all proceeds delivered thereto must hereafter be perpetually held and used in a separate fund for the support and maintenance of a curriculum and/or educational programs associated with a normal school and the educational programs historically held at USD/S and now conducted at other South Dakota institutions of higher education.

368 N.W.2d at 824–25 (footnote omitted). As alluded to earlier on, *Kanaly* was decided under the law, including the statutes then existent. In *Kanaly,* reference to maintenance of a specific fund relied on the then existence of such a fund specifically provided in Chapter 163 of the Session Laws of 1895.

The statement stressed and relied on by Merkwan is taken wholly out of context in relation to the issue being there decided, to-wit:

[C]an it now be asserted that the lands donated by the United States for the normal school system and the land deeded by John A. Burbank for the normal school at Springfield can be transferred *without consideration* to the Board of Charities and Corrections for a prison facility without violating the provisions of the permanent trust fund created by the Enabling Act and Article VIII, § 7 of the South Dakota Constitution?

*Kanaly,* 368 N.W.2d at 824 (emphasis in original). The issue of merger of school trust funds was not before us or even suggested. Therefore, even if we were to acknowledge that the language supports Merkwan's contention, we would have to term it *obiter dicta.*

It appears, in fact, that section 1 of SB 310/1985 accomplishes the pith of our *Kanaly* decision by preserving the trust assets for continued support of other South Dakota normal schools. We can conceive of no logical reason to require the Commissioner of School and Public Lands to maintain a separate trust account for the now extinct USD/S, the proceeds of which account would be used exactly as SB 310/1985 and our decision contemplates. The transfer of USD/S to a penal facility is a *fait accompli.* We see no likelihood that USD/S will rise from the ashes like the Phoenix.

■ Merkwan tells us that because a 1941 proposed amendment of Article VIII, § 7 of the constitution, which would have permitted a different allocation of funds and allowed the apportionment of interest income to other institutions was defeated nearly two to one, this evidences some kind of public policy against the transfer provided in SB 310/1985.

First, we find it illogical to establish public policy by a negative vote. There may be numerous reasons for a "no" vote on one proposal but it does not reflect on the merits of another proposal.

In any event, the 1941 proposal rejected should be comparable. The 1941 proposal, contrary to Merkwan's assertion, did not amend any use of *interest* income. The proposal did make school trust lands subject to lease liable for payments to school districts *from lease income* in an amount equal to what the school tax on the lands would have been if it were subject to taxation, with any balance apportioned to the several institutions for which the grants were originally made.

We do not deem the issue of payments to school districts in lieu of taxation to be in any way comparable to the legislation under consideration.

In the same vein, Merkwan urges that the 1975 Legislature, recognizing that separate trust funds could not be combined in the event that an institution closed,* proposed an amendment allowing the distribution of trust funds of any institution that ceased to operate. He says this is identical to the combination of trust fund money now set out in SB 310/1985. He again contends that the rejection by the electorate at a nearly three to one margin establishes a public policy against SB 310/1985.

Again, we examine the 1975 proposal. It virtually re-wrote Article VIII of our constitution. Out of eighteen sections therein, four survived unscathed, the balance were entirely rewritten or repealed. Section 18, regarding investment of school funds would have also been repealed. Granted, among all of the changes the proposal provided: "If any institution or proposition ceases to operate or exist, its funds shall be disbursed to the remaining institutions in a manner prescribed by law." It also deleted the present provision in § 3 regarding the distribution to school districts of all fines for violations of state law.

We have no record to demonstrate why the electorate rejected the proposed amendment, but considering its scope there are certainly a wide variety of possibilities beyond Merkwan's conjecture that it was a mandate against combining the trust funds

---

* We find nothing in the record to support this assumption. In any event we deem that this court, not the legislature, would be the proper body to determine that issue.

as therein provided. In our view, depriving the schools of monies from fines would be a more viable reason, but that again is speculation and this court should not try to read public policy by speculation.

■ Section 3 of SB 310/1985 amends SDCL 5–7–34, a statute that sets the apportioned shares of various institutions from the revenues derived by the state from oil, gas, and mineral leases of common school, indemnity and endowment lands. Merkwan complains that the amendment unconstitutionally deletes USD/S and its proportionate share, heretofore historically distributed to USD/S, distributing it instead to other penal and charitable institutions and institutions of higher education.

We first note that this issue is wholly independent of any discussion in *Kanaly, supra.* SDCL 5–7–34 implements South Dakota Constitution Article VIII, § 18, Apportionment of Mineral Leasing Money, adopted in November 1954. By its specific wording, the apportionment formula therein contained was adopted notwithstanding the provisions of sections 2, 3, and 7 of the article.

The statutory amendment does indeed delete USD/S and its 1.16729175 share and it does increase the proportionate shares of Black Hills, Dakota State, and Northern State colleges by a total of such percentage points. Contrary to Merkwan's contention, the USD/S share is not redistributed to any penal institution. That is a red herring unworthy of the calibre of counsel involved.

The statute appears to follow the directions of section 18. We do not have a sufficient record to check on the mathematical computations even if we were of a mind to do so. It is not the mathematics that Merkwan challenges, it is the deletion of USD/S from the list of institutions to receive mineral funds. Having lost the first issue, Merkwan automatically loses the second.

We hold that SB 310/1985 is constitutional under the provisions of Article VIII, § 7 of the South Dakota Constitution. We quash the alternative writ of prohibition heretofore issued and we deny Merkwan's petition for a peremptory writ of prohibition.

FOSHEIM, C.J., and HERTZ, Circuit Judge acting as a Supreme Court Justice, concur.

HENDERSON, J., dissents.

WUEST, Circuit Judge acting as a Supreme Court Justice, not participating.

HENDERSON, Justice (dissenting).

I respectfully dissent.

This Court, a mere 134 days ago, in *Kanaly v. State,* 368 N.W.2d 819, 824–25 (S.D. 1985), while recognizing that the Enabling Act and the constitution of this state did not require an institution of higher education to exist at the City of Springfield, stated, plainly, unequivocally, and unanimously:

> Thus, the legislature may decide to close this institution at the City of Springfield and convert the property into other trust assets *provided the trust fund is not thereby impaired. The trust and all proceeds delivered thereto must hereafter be perpetually held and used in a separate fund* for the support and maintenance of a curriculum and/or educational programs associated with a normal school and the educational programs historically held at USD/S and now conducted at other South Dakota institutions of higher education. (Emphasis supplied; footnote omitted.)

As authority for the above statement, this Court cited S.D. Const. art. VIII, § 8. *Kanaly,* 368 N.W.2d at 824 n. 2. S.D. Const. art. VIII, § 7, provides:

> All lands, money or other property donated, granted or received from the United States or any other source for a university, agricultural college, normal schools or other educational or charitable institution or purpose, and the proceeds of all such lands and other property so received from any source, shall be and remain perpetual funds, the interest and income of which, together with the rents

of all such lands as may remain unsold, *shall be inviolably appropriated and applied to the specific objects of the original grants or gifts*. The principal of every such fund may be increased, but shall never be diminished, and the interest and income only shall be used. Every such fund shall be deemed a trust fund held by the state, and the state shall make good all losses therefrom that shall in any manner occur. (Emphasis supplied.)

S.D. Const. art. VIII, § 8, in turn, provides:

*Appraisal and sale of donated lands— Separate accounts.*

All lands mentioned in the preceding section shall be appraised and sold in the same manner and by the same officers and boards under the same limitations, and subject to all the conditions as to price, sale and approval, provided above for the appraisal and sale of lands for the benefit of public schools, *but a distinct and separate account shall be kept by the proper officers of each of such funds*. (Emphasis supplied.)

A simple reading of these constitutional provisions reveals that all lands, money or property donated by the United States or any source for normal schools, must be held in trust by the state, *see Schelle v. Foss*, 76 S.D. 620, 626, 83 N.W.2d 847, 851 (1957), and kept in a separate account. S.D. Const. art. VIII, § 8. This Court unanimously recognized these constitutional dictates and safeguards in *Kanaly* as the above quotation therefrom clearly evidences. We have recognized, since early statehood, the permanent trust relationship, *In re State Bonds*, 7 S.D. 42, 63 N.W. 223 (1895), and that the constitution controls trust management, *Heston v. Mayhew*, 9 S.D. 501, 70 N.W. 635 (1897). The beneficiaries of this trust are the educational institutions of this state, *Schelle*.

The majority, however, now seeks to avoid our unanimous *Kanaly* ruling and our long-established constitutional protections and to do this, the majority advances two avenues of constitutional regress.

First, the majority resorts to a dictionary interpretation of the wording "the specific objects of the original grant." The majority then holds that the 1985 Legislature could "amend or supersede its previous action in 1895 by enactment of SB 310/1985, and thereby *divert* the trust assets from a nonexistent institution to the other existing state normal schools," and that an opposite conclusion is "too narrow a reading of the plain language of the Enabling Act and the Constitution...." (Emphasis supplied.) The word "divert" is defined in Webster's New Collegiate Dictionary 331 (1980) as meaning "to turn in opposite directions, to turn aside, deviate, to turn from one course or use to another, deflect, distract." This is precisely what the majority holding herein does. It turns the Springfield trust assets from one course or use to another. It turns aside from the constitutional safeguards provided in Article VIII, §§ 7 and 8, and it deviates from our unanimous ruling in *Kanaly*. A constitutional interpretation of the relevant provisions and *Kanaly*, however, does not support the majority. Separate accounts is the constitutional requirement, S.D. Const. art. VIII, § 8, and although logic may escape the majority, the majority cannot escape the constitution.

Second, the majority, so as to avoid our clear and unanimous ruling in *Kanaly*, resorts to concluding that the above *Kanaly* quotation is obiter dicta because the "issue of merger of school trust funds was not before us or even suggested." In *Kanaly*, the issue was whether the permanent trust fund provisions of the Enabling Act and the South Dakota Constitution would be violated by a transfer of trust assets without consideration. In concluding that a constitutional violation had occurred, this Court unanimously stated that the trust and all proceeds must be perpetually held and used in a separate fund for the support and maintenance of programs associated with a normal school and historically held at USD/S. *Kanaly*, 368 N.W.2d at 824–25. In the present case, the issue is whether the permanent trust fund provisions will be violated by a merger of the USD/S trust and the trust or trusts held for the other

normal schools. The issue now as then is the same: Do certain legislative enactments concerning the USD/S trust violate our permanent trust fund provisions? In *Kanaly*, we held the enactments there in question to be constitutionally infirm as an impairment of the trust fund and that the trust must thereafter be held and used in a separate USD/S fund. The issues are similar, *Kanaly* is binding, and the *Kanaly* ruling does not constitute obiter dicta.

In *Kanaly*, 368 N.W.2d at 823, this Court held these trusts to be "special, permanent and perpetual" and it is the USD/S trust, not a collection of trusts, that our decision in *Kanaly* protects. The only means by which USD/S trust assets may be placed in another trust fund is by virtue of a constitutional amendment. The constitutional permanent trust fund provisions protect the private givers to higher education and provide that any gift given to higher education will be used in a way consistent with the donor's intent. If not, the concept of a "permanent trust fund" and the constitutional phrase "shall be inviolably appropriated and applied to the specific objects of the original grants or gifts" would be utterly without meaning to higher education in South Dakota. Inevitably, this would result in the conclusion by potential donors that the system of higher education in South Dakota was not a proper steward for donations. To require the state to maintain the separate account necessary to keep the USD/S trust as it has been historically held is a small price to pay for the protection of the integrity of a sacred educational trust and the preservation of a vital constitutional principle. *See Schomer v. Scott*, 65 S.D. 353, 359, 274 N.W. 556, 559 (1937). Indeed, such a requirement is mandated by the constitution itself. *See* S.D. Const. art. VIII, § 8.

Under the majority decision, the constitutional requirements of "separate accounts" and "inviolability" become defiled; all permanent trust funds are commingled together—undefinable—lost in futuristic chameleonic whim by the politicos.

Because I believe the majority ruling does violence to our constitution, our decision in *Kanaly*, higher education in South Dakota, and private donors—past—present—and future, I dissent.