#24989-rev & rem-JKM
**2009 SD 63**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

BRAD OLSON, DUANE ALM,
MICHAEL MILLER, LINDA
BURDETTE, RUSSELL GALL,
MERRITT STEGMEIER, TOMMY
SVATOS, TERRY SVATOS,
DEBBRA J. HOUSEMAN, JOHN
BROOKS, MADELINE FAST
HORSE, KAREN SLUNECKA,
DAWN REDDEN, TERRY AESOPH,
HEATHER BODE, and GRADY
HEITMANN,                                              Plaintiffs and Appellants,

          v.

MARTY GUINDON, Auditor General,
Department of Legislative Audit of
the State of South Dakota, M. MICHAEL
ROUNDS, Governor, State of South
Dakota, LAWRENCE LONG, Attorney
General, State of South Dakota,
and the STATE OF SOUTH DAKOTA,                     Defendants and Appellees,

          v.

SOUTH DAKOTA COALITION OF
SCHOOLS,                                          Intervenor and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

HONORABLE LORI S. WILBUR
Judge

* * * *

ARGUED ON JANUARY 14, 2009

OPINION FILED **07/22/09**

RORY KING of
Bantz, Gosch & Cremer, LLC
Aberdeen, South Dakota

RONALD A. PARSONS, JR. of
Johnson, Heidepriem, Abdallah
& Johnson, LLP
Sioux Falls, South Dakota

LAWRENCE E. LONG
Attorney General

JEFFREY P. HALLEM
Assistant Attorney General
Pierre, South Dakota

Attorneys for plaintiffs
and appellants.

Attorneys for intervenor
and appellant.

Attorneys for defendants
and appellees.

#24989

MEIERHENRY, Justice

[¶1.]     The issue in this appeal is whether school districts have standing to seek a declaratory judgment against Auditor General Marty Guindon, Governor M. Michael Rounds, and Attorney General Lawrence Long (state officials) on the question of the constitutionality of K-12 public school funding in South Dakota.  The circuit court determined that school districts did not have standing and granted summary judgment in favor of Guindon, Rounds, and Long.  We reverse and remand.

*Procedural History*

[¶2.]     School district board members from Aberdeen, Andes Central, and Faulkton Area school districts[1] (school districts) filed the initial complaint for declaratory relief.  The South Dakota Coalition of Schools (Coalition) joined the action as an intervenor.  Formed in 1988 as the South Dakota Coalition of Small Schools, the Coalition is currently governed by a nine member board of school superintendents who work to advance the interests of member school districts.  The Coalition is funded by dues paid by member school districts.  In 2003, the Coalition was incorporated as a non-profit corporation.  The Coalition employs attorneys to lobby the legislature and also employs expert-consultants and attorneys to represent the member school districts.  The Coalition is a member of an organization that

---

1.     The school district board members of the three districts involved in the instant suit include: Brad Olson, Duane Alm, Michael Miller, Linda Burdette, Russell Gall, Merritt Stegmeier, Tommy Svatos, Terry Svatos, Debbra Houseman, John Brooks, Madeline Fast Horse, Karen Slunecka, Dawn Redden, Terry Aesoph, Heather Bode, and Grady Heitmann.

commissioned an adequacy study to determine the level of funding necessary to support South Dakota's required education and learning standards.[2] The results of the study showed that education was seriously underfunded in South Dakota. On June 11, 2007, the school districts filed the original complaint for declaratory relief against the state officials in Hughes County. The complaint challenged the constitutionality of the funding of the K-12 education system in South Dakota. The Coalition joined the suit as an intervenor on June 25, 2007. The Coalition received funding from 96 of the 168 school districts in South Dakota, either in the form of dues or in direct support of the constitutional challenge.

[¶3.] In May 2007, Governor Rounds ordered Auditor General Guindon to determine the legality of the payments made by the school districts in support of the pending litigation. Attorney General Long concluded that the payment of funds by the school districts to the Coalition was illegal and requested the Auditor General to conduct an audit. The school districts and the Coalition challenged the Attorney General's conclusion that the payment was illegal and brought an action for declaratory relief. The parties agreed to suspend the audit. Based upon an agreed stipulation of facts, the parties filed cross-motions for partial summary judgment

---

2.    The organization, the Alliance for Education commissioned the adequacy study to "tie resources to outcomes." Other members of the Alliance include: the Associated School Boards of South Dakota (ASBSD), the School Administrators of South Dakota, the ESD Plus Six (a lobbying organization for school districts), and the Middle Schools Organization. The South Dakota adequacy study is available on the Alliance's website. See *Estimating the Cost of an Adequate Education in South Dakota,* http://www.sdallianceforeducation.org/object/u/AdequacyStudy.pdf (last visited July 13, 2009).

pursuant to SDCL 15-6-56(b). The state officials claimed that the school districts did not have standing to sue the state officials. The school districts claimed that they did have standing to seek a declaratory judgment action; or alternatively, if they did not have standing, they had authority to expend school district monies to finance the litigation through the Coalition.

[¶4.] The circuit court ruled in favor of the state officials and entered a judgment declaring that the school districts lacked standing and did not have authority to finance the litigation. The school districts and the Coalition appeal the issue of whether the school districts have standing to seek a judgment declaring the system of funding K-12 public education unconstitutional; or alternatively, whether the school districts can finance the lawsuit in the absence of standing. We hold that the school districts have standing. Standing is recognized here in the limited context of a declaratory judgment action and stems from provisions in the South Dakota Constitution.

[¶5.] The trial court denied standing based, in part, on prior cases decided by this Court. Edgemont Sch. Dist. 23-1 v. South Dakota Dep't of Revenue, 1999 SD 48, 593 NW2d 36; Agar Sch. Dist. No. 58-1 v. McGee, 527 NW2d 282 (SD 1995). In those cases, we held that the school districts did not have standing to challenge tax levies and distributions. In both cases, we determined that the districts were not the real parties in interest. In *Agar School District*, the district challenged the legality of an increased tax levy and its distribution to other school districts. 527 NW2d at 284. The case did not involve a constitutional challenge of any sort only a dispute over statutes. We determined that the district did not have standing

because it could show no actual or threatened injury. *Id.* at 285. The district had received its requested funds for the school year, and the operation of the district had not been affected. *Id.* In *Edgemont School District,* the district challenged the constitutionality of a state law that set forth the methods of assessment and distribution of a statewide railroad tax. 1999 SD 48, ¶12, 593 NW2d at 39. We determined that the school districts lacked standing to challenge the constitutionality of state legislation. *Id.* ¶15. The rationale centered on the concept that school districts, like counties and municipalities, "are the creatures of the legislature." *Id.* Generally, "'[t]he creature is not greater than its creator, and may not question that power which brought it into existence and set the bounds of its capacities.'" *Id.* (quoting Bd. of Supervisors of Linn County, 263 NW2d 227, 232 (Iowa 1978)). We determined that "[n]one of the exceptions to this general rule regarding standing apply because the taxpayers within the district and county are the real parties in interest and can satisfy the traditional standing requirements." *Id.* ¶16 (citing *Agar Sch. Dist.,* 527 NW2d at 284).

[¶6.] The school districts and the Coalition assert that South Dakota's K-12 public school funding system unconstitutionally underfunds education. The state officials claim that as creatures of the legislature, the school districts do not have standing to challenge the constitutionality of the funding system and that the real parties in interest are the parents and students. To establish standing, the school districts rely on provisions in the South Dakota Constitution that directly and expressly accord school districts rights to certain funds.

*Standing under the South Dakota Constitution*

[¶7.]     Pursuant to the constitutional mandate "to establish and maintain a general and uniform system of public schools," the South Dakota Legislature delegates to local school districts the authority to organize for the purpose of operating schools. *See* SD Const art VIII, §1 (enabling legislation set forth in SDCL 13-5-1). In addition, the legislature gives local school boards "general charge, direction and management of the schools of the district and control and care of all property belonging to it." SDCL 13-8-39.

[¶8.]     The South Dakota Constitution creates and defines the system of public schools. SD Const art VIII, §1 mandates the establishment of a "general and uniform system of public schools" as follows:

> The stability of a republican form of government depending on the morality and intelligence of the people, it shall be the duty of the Legislature to establish and maintain a general and uniform system of public schools wherein tuition shall be without charge, and equally open to all; and to adopt all suitable means to secure to the people the advantages and opportunities of education.

SD Const art VIII, §1. The South Dakota Constitution specifies four sources of funding that go to the local school districts for public education. The first source is the interest from a permanent trust fund, whose principal derives from the sale of public school lands acquired from the United States government, property escheated to the State, gifts and donations, and other property "acquired for public schools." SD Const art VIII, §2. The constitutional provision provides for the permanent trust fund as follows:

> All proceeds of the sale of public lands that have heretofore been or may hereafter be given by the United States for the use of public schools in the state; all such per centum as may be

granted by the United States on the sales of public lands; the proceeds of all property that shall fall to the state by escheat; the proceeds of all gifts or donations to the state for public schools or not otherwise appropriated by the terms of the gift; and all property otherwise acquired for public schools, shall be and remain a perpetual fund for the maintenance of public schools in the state. It shall be deemed a trust fund held by the state. The principal shall never be diverted by legislative enactment for any other purpose, and may be increased; but, if any loss occurs through any unconstitutional act, the state shall make the loss good through a special appropriation.

*Id.*

[¶9.]      SD Const art VIII, §3 directs that the interest and income from the fund "be faithfully used and applied each year for the benefit of the public schools of the state" as follows:

The interest and income of this fund together with all other sums which may be added thereto by law, shall be faithfully used and applied each year for the benefit of the public schools of the state, and shall be for this purpose apportioned among and between all the several public school corporations of the state in proportion to the number of children in each[.]

*Id.*

[¶10.]      Shortly after Article VIII had been approved by the voters, this Court in 1895 determined that the provision made the local school districts "the real owners of the [permanent trust] fund," and the State a "constitutionally appointed trustee." *In re* State Bonds, 7 SD 42, 63 NW 223, 226 (1895). We concluded that: "These funds do not belong to the state, but to the several school corporations. The state is simply a constitutionally appointed trustee, with the imposed duty of

distributing to the real owners of the fund whatever of such moneys have been received by it . . . ." *Id.*[3]

[¶11.]  In 1896 in *State v. Ruth*, this Court for the first time addressed the issue of sovereign immunity for state constitutional officials.  9 SD 84, 68 NW 189 (1896).  While ascertaining that sovereign immunity did exist for discretionary tasks, the Court painstakingly distinguished the State's legal status pertaining to the school trust funds found in Article VIII.  *Id.* at 190.  In regard to the school trust funds, the State's legal status was that of a trustee not that of a sovereign:

> The state appears in this action in its capacity of trustee, and must be treated as a natural person, acting in the same capacity; regard being had to the character of the trust, and the spirit of the constitutional provisions relating thereto.  The rules which regulate ordinary trustees will need to be so applied as to secure and promote the ends contemplated by the constitution.  It is the duty of each branch of the state government to regard the sacred character of this important trust, and to insist upon the utmost fidelity in its management.

*Id.*  These earlier constitutional decisions have been subsequently viewed as particularly persuasive because those cases were decided by Justices who had been members of the Constitutional Convention of 1885 that drafted Article VIII.  *See*

---

3.  This doctrine first surfaced in the Constitutional Debates of 1885.  The following was proposed by two delegates concerning what would become Article VIII.

    Mr. Edgerton:  "I would have the school fund beyond all possible control of the elections of the future state; if there is any fund that should [b]e sacredly set apart beyond a possibility of its being used for such purposes, it is the school fund."  At p. 500.

    Mr. Kanouse:  "The parties who hold this [school] fund, hold it nominally as a sacred trust and against the possibility of its being used for political purposes."  At pp. 515-516.

Schomer v. Scott, 65 SD 353, 274 NW 556, 566 (1937). *See also* McDonald v. Sch. Bd of Yankton, 90 SD 599, 246 NW2d 93, 97 (1976); Green v. Siegel, Barnett & Schutz, 1996 SD 146, ¶19 n10, 557 NW2d 396, 402 n10.

[¶12.]     In 1937 in *Schomer v. Scott*, this Court made it clear that the school corporations were the beneficiaries of the permanent school trust fund. 65 SD 353, 274 NW 556 (1937). We said that "[u]nder the provisions of the Constitution, both the state and the county become trustees of the funds for the benefit of the school corporations of the state." *Id.* at 561.[4]

[¶13.]     The trustee/beneficiary relationship was examined for a fourth time in *Schelle v. Foss*, 76 SD 620, 83 NW2d 847 (1957). There, we held that because of the "sacred character of this important trust," it was no ordinary trust but rather, as the duties were set forth in *In re Bonds, Ruth* and *Schomer,* the trust was for the benefit of "the school corporations of the state." *Id.* at 851. The nature of the trust was defined as follows:

> The framers of our Constitution intended to, and did, establish a special trust for the administration and preservation of our permanent school and educational funds. Article VIII of the Constitution serves as a trust instrument containing the declarations of trust. Its provisions are written in strong, clear, self-expressive language. *Its beneficiaries are all of the public schools in the state together with its endowed charitable and educational institutions.* The trust must be administered for their sole benefit and best interest. An involvement of the trust funds for any other purpose, consideration, or motivation would be in violation of the basic intendment of the trust.

---

4.     At that time, Article VIII, section 11 authorized borrowing from the school funds for mortgages upon farm land. The counties assumed certain legal obligations to see that these funds were repaid. Such loan authority was removed by amendment of section 11 in 1952.

*Id.* at 853 (emphasis added).

[¶14.]     The Constitution establishes a second education funding source from "[t]he proceeds of all fines collected from violations of state laws[.]" SD Const art VIII, §3. The county treasurers collect the fines and distribute them "among and between all of the several public schools incorporated in such county in proportion to the number of children in each, of school age, as may be fixed by law." *Id.* The Constitution also provides two other funding sources for public education – general taxation and local taxation. Article VIII, section 15 requires the legislature to "make such provision by general taxation and by authorizing the school corporations to levy such additional taxes as with the income from the permanent school fund shall secure a thorough and efficient system of common schools throughout the state." SD Const art VIII, §15.

[¶15.]     The funding sources established by the Constitution go to the local school districts for the sole purpose of educating the children of South Dakota. Local school districts are the core of the entire K-12 educational system. The districts are beneficiaries of the permanent trust fund and designated recipients of the fines and taxes earmarked for education. Their position as beneficiaries and designated recipients is established by the South Dakota Constitution. Without adequate funding, the school districts claim they are unable to fulfill their mandate of educating the children of South Dakota. It is undisputed that public education is of utmost importance to the state and its citizens. South Dakota's Constitution requires the legislature "to establish and maintain a general and uniform system of public schools . . . and to adopt all suitable means to secure to the people the

advantages and opportunities of education." SD Const art VIII, §1. The Constitution pronounces that a "general and uniform system of public schools" without tuition and "equally open to all" is important because "[t]he stability of a republican form of government depend[s] on the morality and intelligence of the people." *Id.* Here, all the parties stipulated that "[e]ducation is a matter of great public importance in the State of South Dakota." As the United States Supreme Court said in *Brown v. Board of Education of Topeka,* "education is perhaps the *most important function* of state and local governments." 347 US 483, 493, 74 SCt 686, 691, 98 LEd 873 (1954) (emphasis added).

[¶16.]     Unlike the prior cases of *Agar* and *Edgemont,* the districts and Coalition challenge the constitutionality of the overall system of funding of K-12 public education. The school districts' interest in discharging their constitutional duty is not simply based on their status as representatives of constituent students and taxpayers. In this constitutional challenge, the school districts are not mere creatures of statute. Instead, they are creations of the Constitution via Article VIII. Because of the constitutional provisions and the vital position school districts hold as beneficiaries and recipients of public K-12 education funding, we recognize that school districts have standing to challenge the constitutionality of K-12 public school funding in the limited context of a declaratory judgment action. However, as counsel for the Coalition conceded during oral argument,

> It would be up to the legislature and the executive branch to come up with a solution through the political process. The school funding litigation is not asking for a dollar. It asks for no relief other than declaratory relief and attempts to enforce declaratory relief if certain statutes have to be enjoined as unconstitutional.

*Conclusion*

[¶17.]     Thus, we hold that in the narrow context of seeking a declaratory ruling on the constitutionality of K-12 public school funding that the districts have standing.  Because we determine that the school districts have standing to sue the state officials at this stage of the proceeding, it follows that the school districts also have authority to expend funds to support the litigation.

[¶18.]      We reverse and remand.

[¶19.]     GILBERTSON, Chief Justice, concurs with a writing and SABERS, Retired Justice, concurs.

[¶20.]     KONENKAMP and ZINTER, Justices, concur in result.


GILBERTSON, Chief Justice (concurring).

[¶21.]     I join in the Court's opinion but wish to add a few points.  Before us is the question of the standing of certain school districts within South Dakota to commence a declaratory judgment action against the State.  A substantial portion of oral argument before this Court focused directly upon the relief the school districts were seeking in that underlying proceeding.

[¶22.]     During oral arguments, the school districts stated, "[w]e are seeking declaratory relief.  We are not seeking any kind of a specific amount of appropriation from the State."  Further, "[t]he school funding litigation does not ask for a dollar, and it asks for no relief other than declaratory relief, and attempts to enforce declaratory relief if certain statutes have to be enjoined as unconstitutional."

[¶23.] When the Court asked if the school districts, ". . . would concede . . . that there is no Constitutional authority for this Court to declare itself to be some kind of 'super school board,' that is now somehow, de facto, running the education system of South Dakota," they replied, "[we] would readily concede that. We have made no assertion of that whatsoever." The Court then asked, "What happens . . . if we get to the point where the Legislature says 'so what' [in response to a declaratory judgment]? Do school districts have standing at that point . . . to ask for an order to the Legislature to appropriate the funds?" The plaintiffs responded, "This Court can't appropriate funds. That would violate separation of powers. . . . [The school districts do not have standing] to ask for the Court to appropriate funds. . . ."

[¶24.] Finally, the school districts explained the underlying litigation as,

> [A]n action brought purely under the Declaratory Judgment Act. The [DJA] specifically authorizes public corporations of any character whatsoever to bring declaratory judgment actions, including against the State. This Court placed one limitation on that, in the *Dan Nelson* case. . . 'The holding of *Pennington County* is limited to county suits seeking monetary relief from the State Treasury.' So a governmental entity, a subdivision of government, could not sue the State for money to try to . . . force it to appropriate funds. Although the underlying action involves funding issues, it does not ask for a dollar. It does not seek to disgorge any money from the public treasury.

[¶25.] From the foregoing, it is clear that the school districts seek only a declaration as to the meaning of article VIII of the South Dakota Constitution. Also, they have made it clear that this Court is not being asked to address the issue of the parameters of its authority to mandate any certain dollar amount of school funding. *See generally* McIntyre v. Wick, 558 NW2d 347 (SD 1996).

[¶26.] To arrive at its result of limited standing by the school districts, the Court properly applies the public trust theory to resolve this issue. In its interpretation of article VIII of the South Dakota Constitution, the Court's historical analysis begins with the Constitutional Convention of 1885, which "framed the issues for debate in the 1889 Constitutional Convention and the constitution produced in 1885 was the genesis of the constitution adopted in 1889." Chief Justice David Gilbertson & David S. Barari, *Indexing the South Dakota Constitutional Conventions: A 21st Century Solution to a 125 Year Old Problem,* 53 SD Law Rev 260, 261 (2008) (citing *In re* Opinion of the Judges, 61 SD 107, 246 NW 295, 295 (1933); Schomer v. Scott, 65 SD 353, 274 NW 556, 562-63 (1937); Green v. Siegel, Barnett & Schutz, 1996 SD 146, ¶17 n8, 557 NW2d 396, 401 n8). Our case law since 1889, as cited by the Court, strongly supports standing in this limited case. It is clear from the Court's analysis that this trust theory is limited to article VIII and no case law since 1889 suggests it applies to any subdivisions of government other than the schools.

[¶27.] I cannot join in the concept of standing through what is declared to be "a public interest exception." Until today, such a doctrine has been unknown to our South Dakota Constitution or its interpretative scholarship. Moreover, it is a nebulous term without specific definition. We are not provided with a workable definition of what this term means; instead, we are told in general terms what it is not. Thus, should this exception be adopted, in future cases, what constitutes an issue of "great public importance" will be what three members of this Court conclude it to be. "The Court's inability to formulate a 'judicially discernible standard'

strongly counsels against the recognition of a novel constitutional right." Caperton v. A.T. Massey Coal Co., Inc., __US__, __SCt__, __ LEd2d__, *available at* 2009 WL 1576573, at *20 (June 8, 2009) (Roberts, C.J. dissenting) (citing Vieth v. Jubelirer, 541 US 267, 306, 124 SCt 1769, 158 LEd2d 546 (2004) (plurality opinion)). In future litigation, such a nebulous term invites the once narrow exception to swallow the general rule of no standing.

ZINTER, Justice (concurring in result).

[¶28.] The principal allegation in the underlying school funding litigation is that the Legislature is failing to perform its duty of appropriating *sufficient general funds,* derived from taxation, to maintain a thorough and efficient system of schools as required by article VIII, section 15 of the South Dakota Constitution. The plaintiffs in the underlying litigation do not allege any improper use of the two educational *trust funds* that were created by article VIII, sections 2 and 3 and are relied upon by the majority. *See supra* ¶¶6, 8-15. Therefore, I cannot join the majority's adoption of a theory of standing that is based upon a trust beneficiary's right to appear in actions concerning the use of the beneficiary's trust funds. Instead, I would apply a similar but more limited standing exception than that recognized by the other courts that have considered school funding litigation.

[¶29.] There is no dispute that, generally, governmental subdivisions do not have standing to sue their creator, the state. *See* Edgemont Sch. Dist. 23-1 v. SD Dep't of Revenue, 1999 SD 48, ¶¶13-16, 593 NW2d 36, 39-40. The school districts, however, argue that they have standing under the public interest exception to the

general rule. The question of standing under the public interest exception is a question of first impression in this jurisdiction. Until today, we have applied the general rule disallowing standing to school districts as governmental subdivisions, but we have also acknowledged the exceptions. *Id.*

[¶30.]     A limited exception is justified in this case for three reasons. First, local school districts have a unique constitutional role in both providing and financing K-12 education under article VIII of the South Dakota Constitution. Second, on appeal, the school districts have narrowed the relief they seek in the underlying litigation to that of pure declaratory relief to determine the meaning of the parties' constitutional obligations.[5] Finally, all parties agree that this is an important public interest question. Under these circumstances, we should now adopt a limited standing exception for schools when they seek pure declaratory relief to determine the meaning of the constitutional provision under which they must provide a public education.[6]

---

5.     At oral argument, counsel for the school districts stated that in the underlying litigation, the plaintiffs are "seeking an interpretation of article VIII, what does it mean that . . . the State is to adopt all suitable means to provide an education? Are the school districts entitled to have sufficient funds to provide an adequate education? What does an adequate education mean?"

6.     Although the State relies on authorities finding no standing for governmental subdivisions, those authorities are distinguishable as they either apply to other governmental subdivisions having no specific constitutional duty with respect to the issue in litigation, or the recognized standing exceptions are inapplicable or not discussed. *See e.g.* Denver Ass'n for Retarded Children, Inc. v. Sch. Dist. No. 1 in City and County of Denver, 188 Colo 310, 535 P2d 200 (1975); Lobato v. State, __P3d __, 2008 WL 194019 (ColoApp 2008); Bd. of Supervisors of Linn County v. Dep't of Revenue, 263 NW2d 227 (Iowa 1978); East Jackson Pub. Sch. v. State, 133 MichApp 132, 348 NW2d 303 (1984);

(continued . . .)

[¶31.]     I would not, however, recognize the broad public interest standing exception adopted in many of the school districts' cases. Rather, *Washakie County Sch. Dist. No. One v. Herschler*, 606 P2d 310, 317-18 (Wyo 1980), and a restrictive reading of *Seattle Sch. Dist. No. 1 of King County v. State*, 90 Wash2d 476, 493-94, 585 P2d 71, 82 (1978), provide the most appropriate analysis. In *Washakie County*, the Wyoming Supreme Court recognized standing because schools themselves are tangibly injured if prevented from performing their *constitutionally* required duty to provide the important governmental function of education:

> Educating the youth of our state is an important function performed by our state government. Our constitution. . . plainly expresses the commitment of a free people to the value of a thorough education. The school districts and the members of school boards are charged with the responsibility of providing education to the children of Wyoming and are tangibly injured if the statutes which guide their hands disenable them from so providing.

606 P2d at 317.

[¶32.]     Like Wyoming, the South Dakota Constitution makes local school districts an integral part of financing and providing a thorough and efficient system of common schools. Article VIII, section 15 imposes a joint Legislature-local school district duty to finance schools: the legislative obligation through general taxation and the local school districts' obligation through property taxation. And, annual legislative funding together with property taxation provides the bulk of the revenue necessary for schools to fulfill their constitutional obligation of providing an

---

(. . . continued)
       New York State Ass'n of Small City Sch. Dist., Inc. v. State, 42 AD3d 648, 840 NYS2d 179 (3d Dept. 2007).

adequate education. Therefore, as the Washington Supreme Court concluded, the interest of the schools is sufficiently within the zone of interest recognized by Washington's analogous education clause to afford standing.

> [I]t is clear the District has standing to challenge the constitutionality of the school financing system. The interests of the District are not theoretical; they involve actual financial constraints imposed upon the District by the challenged system itself. In short, the interests sought to be protected by the District are within the zone of interest either regulated by the challenged regulations and legislation or by [the Washington Constitution's analogous education clauses.] Under these circumstances it would be unreasonable to deny standing to the District which, far from being a nominal party, stands at the very vortex of the entire financing system.

*Seattle Sch. Dist. No. 1*, 90 Wash2d at 493-94, 585 P2d at 82.[7]

---

7.   Although I agree with the Washington court's view of school standing in light of the school districts' constitutional obligation to provide education, I would not adopt the Washington court's view of standing for other governmental entities. The State's authorities from other jurisdictions overwhelmingly demonstrate that, absent the constitutional zone of interest that state constitutions provide to schools, other governmental entities, as creatures of the legislature, have no standing. South Dakota has adopted this view. For example, we have stated that:

> Counties and other municipal corporations are, of course, the creatures of the Legislature; they exist by reason of statutes enacted within the power of the Legislature, and we see no sound basis upon which a ministerial (or, for that matter, any other) office may question the laws of its being. The creature is not greater than its creator, and may not question that power which brought it into existence and set the bounds of its capacities.

*Edgemont Sch. Dist.*, 1999 SD 48, ¶15, 593 NW2d at 40 (quoting Bd. of Supervisors of Linn County, 263 NW2d at 232 (quoting C. Hewitt & Sons Co. v. Keller*, 223 Iowa 1372, 275 NW 94, 97 (1937))).

[¶33.]    In the case before us today, the issue of standing arose in a declaratory judgment action in which the interests at stake involved the joint school district-legislative obligation to provide an adequate public education. The school districts specifically alleged that they are under threat of sanctions for failure to meet state-imposed standards of educational achievement.[8] They further allege injury to their ability to meet state and constitutional requirements. Under those circumstances, even the jurisdictions that strictly apply the general rule barring governmental subdivision challenges to legislative decisions recognize an exception. The exception applies when schools seek an interpretation of the law they were required to implement, but also alleged that by their very compliance, they will be forced to violate a constitutional provision. *See* City of New York v. State, 86 NY2d 286, 292, 655 NE2d 649, 652 (1995) (citing Matter of Jeter v. Ellenville Cent. Sch. Dist., 41 NY2d 283, 287, 360 NE2d 1086, 1088 (1977)) (additional citation omitted) (concluding that the school board had standing to seek a declaration interpreting the meaning of laws governing the right to a free public education, but they did not have the substantive right to challenge those laws).

[¶34.]    As previously indicated, at oral argument in this case the school districts limited their request for relief, stressing that standing was appropriate as they should be entitled to seek a determination of the "meaning" of article VIII, section 15. *See supra* note 5. Considering this limited question, considering the unique constitutional status and duties of schools regarding K-12 education, and considering the agreement that the underlying issue is a matter of great public

---

8.    *See, e.g.,* SDCL §§ 13-3-62, 13-3-69, 13-6-2, 13-13-11.

importance, I agree with the previously cited authorities holding that schools have standing to seek declaratory relief under the public interest exception. It must, however, be emphasized that such standing should only be recognized at this stage of the proceeding, and then only for the limited question of interpreting and determining the meaning of the education clauses and statutes.[9] To this extent, I concur in result.

9. In the underlying litigation, the circuit court dismissed all claims except those seeking declaratory relief. That litigation has not been finalized and it is not known if the dismissed claims may be the subject of an appeal. In any event, in light of the Schools' appellate limitation on their request for relief, *see supra* note 5, it should be understood that today's decision is no authority for the proposition that public schools have standing to take the often utilized step of also seeking enforcement of a declaratory ruling, which might, for example, include a request for monetary or other affirmative relief against the State. *See* Dan Nelson Auto., Inc. v. Viken, 2005 SD 109, ¶¶30-31, 706 NW2d 239, 251-52 (restating that declaratory relief is unavailable to governmental subdivisions seeking monetary relief from the state treasury).

For the same reason, today's decision should not be understood to mean that school districts have standing to seek the other relief they initially sought in the underlying litigation; namely,

> That the [circuit] court issue appropriate writs of mandamus, writs of prohibition, and/or interim and permanent injunctive relief to bring defendants into compliance with article VIII of the South Dakota Constitution, to prohibit the defendants from administering, enforcing and/or funding those provisions of the public school financing system that are unconstitutional, and to remedy the continuing violation of plaintiffs' constitutional education rights; and

> That the court retain jurisdiction and maintain judicial oversight to assure that the Legislative and Executive departments act appropriately to correct the constitutional inadequacies of the public school finance system that presently exists in South Dakota.

Third Amended Complaint, 83.

[¶35.]     The majority's standing exception is based on a theory of trust law*; i.e.,* that a trust beneficiary has standing when asserting a claim of "right" to trust funds. *See supra* ¶6 (stating: "To establish standing, the school districts rely on provisions in the South Dakota Constitution that *directly* and *expressly* accord school districts *rights* to certain funds") (emphasis added). The majority relies on case law and constitutional provisions recognizing the school districts' direct and express rights in two trust funds. The first is the perpetual trust fund established by article VIII, section 2, which is funded from the sale of public lands, escheated property, and gifts. The second is the trust for collected fines established by article VIII, section 3. *See supra* ¶¶8-13 (discussing the perpetual trust fund) and *supra* ¶14 (discussing the proceeds of fines).

[¶36.]     School districts do not, however, seek relief in the underlying litigation for any act or omission with respect to these two *existing* trust funds. Instead, according to the Third Amended Complaint, the school districts seek a larger *future legislative appropriation* of *general funds* through general taxation under the article VIII, section 15. Critically, that constitutional provision leaves some discretion to the Legislature, and it certainly has not created a trust fund. Article VIII, section 15 merely provides that the Legislature shall "make such provision by general taxation [which shall with other funds[10]] secure a thorough and efficient system of common schools throughout the state."

---

10.    Although article VIII, section 15 also provides that the Legislature shall make provision for the school corporations to levy such additional local taxes, there is no allegation in the underlying complaint that the Legislature has failed to authorize the school districts to levy local taxes for their schools.

[¶37.]     Consequently, article VIII, section 15 -- the focus of the underlying litigation -- does not provide school districts with any direct or express right to any trust fund, and it certainly does not provide school districts with trust rights in the funds they seek: future increased appropriations. After all, the Legislature could, as it did in 1996 after the last school funding litigation, completely repeal and adopt a new method of funding K-12 education. *See* 1996 Session Laws ch 69, "An Act to revise and repeal certain provisions relating to state aid to education." Therefore, although *Schelle v. Foss*, 76 SD 620, 83 NW2d 847 (1957) and *State v. Ruth*, 9 SD 84, 68 NW 189 (1896) support the theory that school districts would be injured parties with standing if the trust funds in article VIII, sections 2 and 3 were not being used in accordance with constitutional requirements, that is not the allegation in the underlying litigation. For that reason, school district standing based on a trust beneficiary's "rights" to trust funds has no application in this case.[11]

[¶38.]     KONENKAMP, Justice, joins this special writing.

---

11.    There is one limited exception. To the extent the underlying plaintiffs allege inappropriate use of the article XII, section 6 Education Enhancement Trust Fund, the majority's trustee beneficiary theory could apply. That does not, however, appear to be the *focus* of the underlying litigation.